## BRADSTREET CO. OF MAINE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2777.

Circuit Court of Appeals, First Circuit.
June 30, 1933.

R. Randolph Hicks and F. Morse Hubbard, both of New York City (Satterlee & Canfield and Barham R. Gary, all of New York City, on the brief), for petitioner.

J. Louis Monarch, Sp. Asst. to Atty. Gen. (Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and T. M. Mather, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This petition for review of a decision of the Board of Tax Appeals involves income taxes for the years 1920, 1921, 1923, 1925, and 1926, in the respective amounts of $101,634.13, $8,186.58, $13,306.25, $15,352.55, and $2,221.43, and certain overassessments for the years 1922 and 1924.

The material facts are as follows: The petitioner, Bradstreet Company of Maine, hereinafter referred to as the Maine company, is a corporation organized under the laws of the state of Maine, having its principal office at Portland, Me.

The petitioner, the Bradstreet Company, hereinafter referred to as the Connecticut company, is a corporation organized under the laws of the state of Connecticut, having its principal office at New York City.

A third affiliated corporation is the Bradstreet Realty Company, a corporation organized under the laws of the state of New York.

Through the taxable years in controversy, the Maine company owned all of the capital stock of the Connecticut company and of the realty company, and the three filed a consolidated return for those years as well as for the prior years of 1918 and 1919.

The Connecticut company is the operating company, and its income is the subject of controversy. The Maine company is a holding company, holding all the capital stock of both the Connecticut and New York companies. The Connecticut company is engaged in the business of compiling and furnishing information concerning the financial responsibility and credit of merchants, manufacturers, bankers, and other mercantile persons. It engages in no type of business not identified with or incidental to that of furnishing such information. The information is furnished by the loaning of rating books and the furnishing of reports. The rating books are merely loaned and are not sold. When new books are de-

livered to subscribers, the books then in their possession are taken up and are scrapped.

The standard subscription agreement, which is operative for one year, provides that the subscriber employs the Connecticut company to investigate and furnish within a certain term information of record in its office or obtained within the period specified concerning persons, firms, and corporations transacting a mercantile business as principals within a certain territory. The subscription contract requires a payment in advance, and provides for the loan to the subscriber of a specified number of books and the furnishing of not to exceed a stipulated number of reports. Books and reports furnished in addition to the maximum number specified in the subscriptions are paid for as they are furnished. The subscription prices vary according to the territory and the number of books and reports stipulated in the subscription. Some subscribers ask for their full quota of reports under their subscriptions before their subscription terms have expired. The large majority of subscribers, however, do not ask for their full quota of reports prior to the expiration of the subscription term. In the subscription agreement the Connecticut company reserves the right to reject or cancel a subscription at any time and recall the volumes loaned, "allowing for the unearned portion of the above-mentioned consideration."

The Connecticut company operates a printing plant and bindery for the production of the volumes loaned to subscribers. The materials and supplies used in the printing plant and bindery are inventoried at the close of each fiscal year. The standard book is printed in four quarterly volumes, January, spring, July and fall. There are two editions in the spring, in March and April, and two in the fall, in September and October. The number of books to be printed is based upon requisitions received from the field offices. These books are in preparation for approximately two months before release. Copy for the January edition begins to come in during the last week of October, and the printing of this edition is completed in early or middle December, and the edition is ready for delivery on or about the 1st of January. That is typical of the conditions relating to the printing and the distributing of the other quarterly books. On April 30th, the end of the fiscal year, few books are on hand in the printing department, on the average about one hundred; the spring deliveries to the field offices having been completed by that date.

In order to keep its files of information up to date, the Connecticut company is required to make investigations continually throughout the year. These investigations are made by a regular staff of reporters employed for this purpose. Information gathered in this way forms the basis for the constant revision of reports in the company's files and also a revision of the names listed in the standard book.

The expenses of the Connecticut company, although constantly increasing, are fairly uniform throughout the various months of each calendar year; that is, there is no group of months in which the expenses greatly exceed those of the other months of the year.

The Connecticut company has for a long period of years kept its books on a semiaccrual basis, with its fiscal year ending April 30th. Since the passage of the income tax law, the Maine company and its affiliated companies have made a tax return on the basis of the calendar year, as they had a right to do, until the passage of the 1918 act.

By section 212 (b) of the 1918 act (40 Stat. 1064), the Connecticut company was required to compute its net income according to its annual accounting period, unless such method of accounting did not clearly reflect its income, in which case the Commissioner might require it to be computed upon such basis and in such manner as in his opinion would clearly reflect the taxpayer's income.

The petitioner, however, after the passage of the 1918 act, continued to compute the net income of the Connecticut company, and paid its tax, which was accepted, on the basis of the calendar year for all the years from 1917 up to and including 1926.

On March 14, 1928, the taxpayer was notified that there was a deficiency for the year ending April 30, 1920, of $101,683.26; for the year ending April 30, 1921, of $8,186.57; for the year ending April 30, 1922, of $571.61. On October 18, 1928, notice of a deficiency tax for the years ending April 30, 1925 and 1926, amounting to $19,505.08, was given to the taxpayer, together with a notice of an overpayment for 1924 of $1,931.10.

The taxpayer, while keeping its account on a fiscal year basis, was in effect doing business on a calendar year basis, as its subscription periods were in the main, if not entirely, for the calendar year.

The petitioner therefore contends that the net income of the Connecticut company is most clearly reflected by computing it on the calendar year basis, as it has been accustomed

to do in making the return, and that a return on its fiscal year basis does not fairly reflect the net income, since approximately one-half of the gross income is received within the last four months of the fiscal year, or from January 1st to April 30th, and the expense incurred in earning that income is chiefly incurred in the following eight months of the calendar year; and, since its business increased from year to year at consequent increasing expense, and the expenses incident to earning the income received from January 1st to April 30th is largely spread over the following eight months of the calendar year, to compute its tax on the basis of its fiscal year results in the lesser expenses of the first eight months of a fiscal year being offset against approximately one-half of its gross income received in the first four months of the following calendar year, which, owing to the nature of its business, is earned at constantly increasing expense during the last eight months of the calendar year. Clearly to reflect its net income, its expenses incurred in earning its gross income should, so far as possible, be offset against the latter.

The government contends that the taxpayer should have changed its basis for filing its returns in the year 1918, and in accordance with the provisions of sections 212 (b) and 226 of the 1918 act (40 Stat. 1064, 1075) should have filed a return for the period from December 31, 1917, to April 30, 1918, and from then on it should have filed its returns according to its fiscal year, and, since it did not do so, the Commissioner was warranted in rejecting the return for the calendar years 1920, 1921, 1922, 1923, 1924, 1925, and 1926, and in computing its net income according to the taxpayer's own method of accounting, and applying all payments made during those calendar years according to the rule laid down in American Hide & Leather Co. Case, 284 U. S. 343, 52 S. Ct. 154, 76 L. Ed. 331, and which method and rule the Board of Tax Appeals found resulted in a deficiency for the year ending April 30, 1920, of $101,634.13; on the same basis for 1921 of $8,186.58; for 1923, $13,306.25; for 1925, $15,352.55; and for 1926, $2,221.43, with an overassessment for 1922 of $571.61; and for 1924 of $1,-931.10.

Owing to the peculiar nature of the business of the Connecticut company, it is difficult, and from the record impossible, to determine any method of computing its net income which would clearly and fairly reflect its net income. We think there is much to be said in support of the method of accruing its

subscription receipts on the basis contended for by the petitioners, though the more equitable method would appear to be to change its accounting period to the calendar year, but we make no finding in this respect.

However, the record does not sufficiently disclose that as a matter of law the Commissioner abused his discretion in following the accounting period adopted by the taxpayer itself, except arbitrarily in computing the tax for the full year ending April 30, 1920, for eight months of which the taxpayer had already paid a tax computed on a calendar year basis, which had been accepted by the Commissioner, and the return of 1918 and 1919 closed without finding any deficiency in the tax for the calendar year 1918 or 1919. The burden to adopt a method that will clearly reflect the income is on the Commissioner equally as well as on the taxpayer.

The government admits this arbitrary method has resulted in double taxation for the last eight months of the calendar year 1919, but justifies its action by saying that the taxpayer has not shown to what extent double taxation has resulted, and that the taxpayer is at fault in not following the method provided by the 1918 act in making its returns for 1918 and 1919 and 1920, and should have furnished figures for the assessment of taxes according to its fiscal year beginning with the first four months in 1918. It appears, however, that the government had the figures of receipts and disbursements furnished by one of its agents for the calendar year 1919, and according to a stipulation by counsel found no deficiency in its taxes for the years 1918 and 1919. The Commissioner had authority to require the return for the years 1918 and 1919 on the basis of the calendar year, if its net income was more clearly reflected thereby, and under the stipulation of the parties must be held to have approved the taxpayer's return for those years on that basis as clearly reflecting its income.

We think it was error to begin computing the taxpayer's net income from April 30, 1919, without regard to the fact that it is agreed that no deficiency existed for the years 1918 and 1919. The government concedes this was done, and the amount of the deficiency found by the recomputation for the year ending April 30, 1920, renders it certain that such must have been the basis on which the Commissioner found a deficiency of over $100,000.

Upon the record we are not disposed to disturb the findings of the Board for the fol-

lowing years as being erroneous as a matter of law, but its decision should be reversed as to the finding of the deficiency of the year ending April 30, 1920, and the case remanded, and the tax liability for all years prior to January 1, 1920, be considered closed in accordance with the stipulation of the parties, as though the Commissioner had for those years found that a return for the calendar year did clearly reflect the taxpayer's net income and a change in the basis for computing the tax from the calendar year to the fiscal year was made in the year 1920, and the tax for the period from January 1, 1920, to April 30, 1920, be computed in accordance with the provisions of section 226 of the Act of 1918. While it may not fairly reflect the net income for that period, the taxpayer has brought whatever inequality results upon itself.

The decision of the Board of Tax Appeals is reversed, and the case remanded to that Board for further proceedings not inconsistent with this opinion.