ANTHONY DELSANTER, ET AL.,* PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 49167, 52463, 52515, 52557. Filed July 18, 1957.

*Michael E. Cozza, Esq.*, and *Arlene B. Steuer, Esq.*, for petitioners in Docket Nos. 49167 and 52515.

*Proceedings of the following petitioners are consolidated herewith: Estate of Mary Catherine Tobin, Deceased, Edward F. Tobin, Administrator, and Edward F. Tobin, Individually, Docket No. 52463; John Farah and Shamis Farah, Docket No. 52515; and Ralph Coletto and Tessie Coletto, Docket No. 52557.

*Protagoras D. Maktos, Esq.*, and *John J. O'Brien, Esq.*, for petitioners in Docket No. 52557.

*Russell G. Mock, Esq.*, for petitioners in Docket No. 52463.

*James F. Kennedy, Jr., Esq.*, and *R. G. Daha, Esq.*, for the respondent.

854

**OPINION.**

Raum, *Judge:* 1. Petitioners Farah, Tobin, Coletto, and Delsante were partners in a gambling venture of considerable magnitude. The partnership operated a casino known as the Jungle, near Youngstown, Ohio, which provided its patrons with gambling facilities on an extensive scale. It continued to function during the taxable years until the casino was raided by State authorities in the evening of August 12, 1949.

Farah was plainly the dominant figure. The evidence shows that he furnished the physical facilities for the enterprise, that he controlled the bankroll, that he alone knew the combination of the safe in which the funds were kept, and that he had a 40 percent partnership interest. Tobin and Coletto, although playing important and

active parts in the day-to-day conduct of the business, appear to have been subordinate to Farah. Initially, their interests were 25 per cent each, but later, when illness caused one of them to curtail his activities for a substantial period, they readjusted their interests to 20 and 30 per cent. The position of Delsanter, on this record, seems to be highly mysterious. The evidence does not show that he contributed any capital to the partnership or what, if any, services he rendered to it. His 10 per cent interest in the venture could give rise to teasing speculation, but since no question is presented with respect to his participation, we pass over the matter as being outside the issues raised in this litigation.

Seven separate and distinct gambling operations were conducted by the partnership at the Jungle; Dice games, poker games, roulette, bingo, chuck-a-luck, slot machines, and a horsebook. The Jungle was inaccessible except by automobile or taxi, but it had about 300 patrons a night during the first 4 days of the week, and attendance ranged from 500 to 700 during Fridays, Saturdays, and Sundays. The horsebook was operated 6 days a week, and the evidence shows that there may have been some "action" at the poker and dice tables in the afternoons; all forms of gambling except the horsebook were open to patrons and were actively indulged in 7 nights a week.

With the exception of the slot machines, profits from the various operations were determined daily. The net amount of the funds from each operation in excess of the bankroll assigned to such operation was treated as a profit, and any deficiency as a loss. Such profit or loss for each operation was recorded on an adding machine tape. On 2 nights a week the collections from the slot machines were added. These nightly computations took place in Farah's office. At least two partners were always present, in order to insure the integrity of the computations. The results of the day's operations were added to the bankroll for the entire enterprise as of the close of the previous day. A copy of the tape was given to each partner, who thereupon destroyed his copy of the tape for the previous day. There was also recorded by pencil on a slip of paper the date and a single figure preceded by a single word, "win" or "lose," and this slip was picked up by the bookkeeper for the venture, who entered it in a so-called ledger. There was one page in the ledger for each month and the total for each month accurately reflected the information made available to him by the slips. He prepared returns for the partnership and the individual partners, which were faithfully in accord with the ledger.

We have no doubt that the tapes prepared in Farah's office each evening for the use of the partners contained reliable data as to the profits of the partnership. And if the penciled slips given to the

bookkeeper accurately showed what was recorded on the tapes, there would be no deficiencies here. However, none of the tapes was available to the Government and none was produced in evidence. We have only the word of several of the partners that the bookkeeper was given the correct figure each day. In substance, petitioners have attempted to hide behind an impenetrable wall and they tell us that the Government must accept that daily figure without any opportunity to check its accuracy. Moreover, it was made abundantly clear by the testimony of the partners that they never allowed a partner to count any winnings by himself, in the absence of another partner. It would be asking too much of the respondent to expect him, in turn, to extend more trust to the partners collectively than they extended to each other individually. If we were to believe their story about the accuracy of the now nonexistent slips, that would be an end to this case. But the Judge who presided at the trial and had ample opportunity to observe the witnesses does not believe that they were telling the truth, and we cannot accept their testimony as credible. We do not deem it necessary to set forth the respects in which we find unworthy of belief the assertion that the slips given to the bookkeeper and recorded in the ledger accurately reflected the earnings of the enterprise. Our conclusion is based on the entire record. However, one example will suffice to raise serious doubts as to the reliability of the ledger. The evidence was clear that patronage, and consequently profits, increased as the inclement winter weather ceased. Yet the ledger shows no significant difference in profits as between different seasons of the year.

This case is unlike *H. T. Rainwater*, 23 T. C. 450, where the records produced were shown to have been used by the partners in determining the amounts of their distributive shares as against the dominant partner, a circumstance that provided a reliable check on the accuracy of the figures presented to the Commissioner and to this Court. This brings us then to the question as to what disposition of the controversy should be made here. The answer to that question is to be found in connection with the applicable burden of proof in this litigation.

Plainly, the burden of proof was upon the petitioners. And to the extent that we find incredible their testimony that they accurately furnished their bookkeeper with the results of their daily operations, the burden has not been carried. Rather than attempting to show by credible evidence what profits were realized from each of the various gambling operations[2] conducted at the Jungle, petitioners took the offensive and challenged the Commissioner's determination as arbitrary. The trial to a considerable degree involved an attack

---

[2] Petitioners did present some evidence as to earnings from some of the games, but it was not of sufficiently comprehensive character to enable us to determine the correct income of the entire enterprise.

upon the revenue agent who had made the investigation and an attempt to discredit the formulas that he used in computing profits from the various gambling operations. Thus, they focus upon admissions made by him that he used formulas or factors given to him by his superiors based, as he understood, upon wide experience within the Internal Revenue Service in dealing with such activities. Somehow or other, petitioners seem to think they have discredited the Commissioner's determination by showing that the agent accepted the formulas given to him and that he could not testify of his own knowledge as to their reliability. But the revenue agent is not the Commissioner of Internal Revenue. The Commissioner, of necessity, must rely upon the assistance of many subordinates in his organization, and his determination often represents the product of study and investigation conducted by many persons. It is no answer here to say that the particular agent on the stand was unable to support each formula used, or that he relied upon instructions or information furnished to him by other subordinates of the Commissioner who were not before the Court. Of course, if the burden were on the Government in this case, then plainly enough the agent's testimony here would not be sufficient to carry it. But the burden was not on the Government, and we will not lightly assume that the formulas he used were without rational foundation. The petitioners cannot discharge their burden merely by showing that the agent followed instructions of his superiors in using formulas which they supplied to him and which he understood were worked out on the basis of experience in the field. The burden was not on the Government to produce evidence justifying the Commissioner's determination. The burden was on the petitioner to show that the determination was erroneous. If that burden was difficult to meet by reason of their destruction of their records, it is a situation that they created for themselves. But they cannot shift the burden to the Commissioner and then complain that, since he has not put witnesses on the stand justifying his determination, it is arbitrary and must therefore be disapproved. We cannot say, apart from certain modifications required by the evidence and upon which we will comment below, that the computations made by the agent were unreasonable and that the profits he calculated for each operation did not fairly reflect the gains realized by the partnership.

*Horsebook.* The petitioners have not shown that the agent's method of determining income by taking 12 per cent of the total bets was arbitrary. The agent proceeded upon a reasonable assumption that the 12 per cent formula furnished to him by his superior was based upon a nationwide experience with establishments of this type. Indeed, petitioner Tobin testified to the effect that he thought the partnership retained 10 or 11 per cent. Certainly, the use of the 12 per cent formula has not been shown to be arbitrary.

The agent applied this formula to an assumed total of bets averaging $3,000 a day. We think, on the evidence, that this figure must be revised. It is our best judgment on the record that the average total amount bet at the Jungle horsebook on weekdays during the period before the Court was $2,500, and that the average total amount bet on Saturdays was $3,500. We have made a finding to that effect.

*Dice.* Here, too, the respondent used a formula to determine income. It was a formula which the agent understood from his superior to be based upon a nationwide experience with dice operations such as were carried on at the Jungle—namely, that it was the usual practice in such operations to employ a staff requiring a salary of not more than 10 per cent of the amounts retained by the house as winnings. Petitioners presented no evidence tending to show that the formula used was lacking in validity, or that there were circumstances rendering it inapplicable to their operation.

The agent conservatively applied the formula to the staff of only one table, although it was customary to open a second table before the evening was over; and, again with conservatism, he used a staff of four, instead of the full complement of five which included the relief man. Since these employees were paid $20 a night, he arrived at the conclusion that the profits amounted to $800 a night or $5,600 a week. The petitioner Coletto himself indicated that the dice operation brought in $5,000 a week. In the circumstances, we do not regard the agent's conclusion in this respect as arbitrary, and we have found as a fact that the Jungle's dice operation had average weekly net winnings of $5,600.

*Slot machines.* The revenue agent computed income from the slot machines on the assumption that the amount given to the change makers each night in this operation was $1,500, and that the entire $1,500 represented gross play; and, on the knowledge that another Ohio slot machine operator using standard machines realized gains equal to 79 per cent of the gross play, he applied that percentage to the $1,500 figure to obtain the earnings of the partnership in this department. We think, on the evidence, that the figure reached by the agent must be revised downward.

We are satisfied that there is some correlation between the amount of cash given to the change makers and the gross play, but, on the evidence, we have found that the nightly amount given to the change makers was $1,080. This does not mean that the 79 per cent formula should be applied to this figure. That formula appears to have been based on a far more limited experience than those employed with respect to other forms of gambling, nor is it clear that the amount given to the change makers should be taken as the equivalent of the gross play. While it appears that they generally did not use all the

change each night, and while it is by no means certain that all coins obtained by patrons from the change makers were played, those circumstances could be more than offset by the amount of coins played that did not originate with the change makers and the amount of coins replayed by patrons who had obtained winnings from the machines.

Notwithstanding the foregoing difficulties, we are aided in one important respect in arriving at a reasonable estimate of the nightly winnings of the house from slot machines. Our findings show that there was a total of $926.70 in the collection boxes of the slot machines at 9 : 30 p. m., Friday, August 12, 1949, at the time of the raid. The boxes had been emptied, according to the practice of the house, on Thursday, and since winnings were computed nightly at the conclusion of the evening's operations, we must assume that the amounts in the collection boxes represented winnings that were primarily the result of play on Friday. Certainly, petitioners have not shown that they contained any Thursday winnings. At 9 : 30, the evening was still young, and had the raid not occurred it is plain that the profits would have been considerably higher before the end of the evening. However, taking into account the fact that it was summertime and that the day was a Friday when patronage was higher than average, it is our best judgment that the partnership's earnings from slot machines over the entire period in question averaged $1,000 a day and we have so found as a fact.

*Poker, roulette, and chuck-a-luck.* Respondent concluded that aggregate gains from these three operations were realized at the rate of $50,000 per 52-week year, and he determined the profits from these games by prorating that amount over the number of weeks in 1948 and 1949 that the partnership was operating the Jungle. The record shows that the agent did not rely upon any specific facts or use any formula in the selection of the $50,000 figure. However, the record does contain evidence from which it is possible to make a reasonable estimate as to the profits derived from these games.

On the basis of the evidence before us we have found that the Jungle's 5 per cent profit on poker averaged $20 per hour. Poker was played not less than 4 hours a night, and there were occasional daytime games. We have found that the partnership's profits from poker averaged $600 a week. The evidence as to roulette and chuck-a-luck was meager. Apparently, they were not significant aspects of the over-all operation of the establishment. The odds were in favor of the house, but in view of the limited play, we could not find on the record that the winnings were substantially in excess of the salaries of the employees who were in charge of these games. Accordingly, we have found that the profits from roulette and chuck-a-luck were not less than $140 and $250 a week, respectively.

*Bingo.* The respondent treated bingo as a "break-even" operation and attributed neither gain nor loss to it. The evidence shows that the bingo games were the lure that attracted the large number of patrons to the casino, that the partnership expected to make its profits in the evenings from other forms of gambling in which patrons would participate once they were present, notably dice and slot machines, and that there was no intention of deriving any profit from the bingo games. Moreover, it is persuasive from the evidence that the bingo games were in fact operated at a substantial loss. Petitioners' counsel, on brief, suggest that the loss might be taken to be $1,000 a week. Although the evidence might support a larger figure, we have accepted the suggestion of petitioners' counsel as reasonable, and have found as a fact that the bingo games were operated at a loss of $1,000 a week.

2. The next question is whether petitioners are liable for additions to tax under sections 294 (d) (1) (A) and 294 (d) (2), Internal Revenue Code of 1939.[3] Contrary to respondent's contention, this issue was raised by all of the petitioners in their respective petitions.

Section 294 (d) (1) (A) provides for an addition to tax in the case of a failure to make and file a declaration of estimated tax unless the failure is due to reasonable cause and not to willful neglect. Section 294 (d) (2) provides for an addition to tax for substantial underestimate of estimated tax.

This Court has consistently upheld the imposition of additions to tax for failure to file a declaration of estimated tax and concurrently the imposition of the additions to tax for a substantial underestimate of the estimated tax, pursuant to the provisions of sections 294 (d) (1) (A) and 294 (d) (2). See *G. E. Fuller*, 20 T. C. 308, affirmed 213 F. 2d 102 (C. A. 10); *Fred N. Acker*, 26 T. C. 107; *John R. Rictor*, 26

---

[3] SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT.

   (d) ESTIMATED TAX.—

     (1) FAILURE TO FILE DECLARATION OR PAY INSTALLMENT OF ESTIMATED TAX.—

     (A) Failure to File Declaration.—In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35.

     *      *      *      *      *      *      *

     (2) SUBSTANTIAL UNDERESTIMATE OF ESTIMATED TAX.—If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *

T. C. 913. See also *Clayton* v. *Commissioner*, 245 F. 2d 238, (C. A. 6, 1957) affirming T. C. Memo. 1956-21.

In the instant case, the parties orally stipulated at the hearing that "Taxpayers John Farah and Anthony Delsanter, Edward Tobin and Ralph Coletto, forwarded declarations of estimated tax for the year 1948 to the collector of internal revenue for estimated income of zero for said period."

On opening statement counsel for respondent stated that a search of the records of the director (formerly collector) had failed to disclose any record of the filing of estimated tax by any of the petitioners for 1949. While statements of counsel are not to be taken as evidence, this statement did serve to put petitioners on notice. The burden was on petitioners to prove that declarations of estimated tax were filed for the year 1949. They have not met that burden, and we have found as fact that no declaration of estimated tax was filed by any of the petitioners for the year 1949.

The petitioners have not shown that their failure to file declarations of estimated tax for the year 1949 was due to reasonable cause and not to willful neglect. The statute contains no provision excusing an underestimate of estimated tax on a showing of reasonable cause.

Considering all the circumstances, we hold that each of the petitioners is liable for the additions to tax imposed by sections 294 (d) (1) (A) and 294 (d) (2) for the year 1949, the amounts thereof to be computed under Rule 50. We likewise hold that each of the petitioners is liable for the additions to tax imposed by section 294 (d) (2) for the year 1948, the amounts thereof to be computed under Rule 50. See *G. E. Fuller* and *Fred N. Acker*, both *supra*.

The question remains whether each of the petitioners is liable for addition to tax for failure to file a declaration of estimated tax for the year 1948, pursuant to section 294 (d) (1) (A), where the declaration filed showed an estimated tax of zero. Respondent, in substance, argues that petitioners did not attempt to make a bona fide estimate of their 1948 tax on their declarations filed for that year, and that this amounts to a failure to file a declaration. We do not agree.

In section 294 (d) (2) Congress provided for an addition to tax where there is a substantial underestimation of tax, and it is not for respondent to provide for a second addition where the substantial underestimation is deliberate. If the legislature had intended such a result it would have been a simple matter so to provide. Cf. sec. 293, I. R. C. 1939.

Additionally, respondent points out that petitioners themselves did not estimate their 1948 taxes or file the required declarations, and that these acts were done by their attorney-bookkeeper. This, respondent maintains, does not satisfy the requirements of section 294 (d) (1)

(A). There is little merit to the argument. The declarations were in fact signed by the petitioners, and we would open a Pandora's box if we undertook to go behind them to inquire to what extent each petitioner went through a mental process the results of which were reflected on the declarations.

3. The petitioners John Farah and Shamis Farah allege that either they or the partnership was entitled to deductions for depreciation on 100 slot machines in 1948 and 1949 and for a loss occasioned by the confiscation and destruction of the machines by public officials of the State of Ohio in 1949. In view of our holding that none of the deductions can be allowed on this record, it is unnecessary to decide who is entitled to the deductions.

The claimed depreciation deduction must be denied for complete failure of proof. All the record shows is that Farah acquired the slot machines in 1947 and replaced a few of the machines in 1948. The record does not disclose what amount, if any, he paid for the slot machines, their useful life, and the amount, if any, allowed or allowable as depreciation on the machines in 1947. On the record we are unable to determine even the minimum amount which should be allowed as depreciation in 1948 and 1949.

Similarly, no loss deduction can be allowed for the confiscation and destruction of the slot machines in 1949, there being no showing that these machines had any basis to any of the petitioners at that time. It thus becomes unnecessary to consider whether the loss must be denied in any event because it was like a fine or forfeiture. Cf. *G. E. Fuller, supra*. See *Boyle, Flagg & Seaman, Inc.*, 25 T. C. 43, 49–50.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: The Commissioner determined that the zero declarations were insufficient to avoid the imposition of additions to the tax under section 294 (d) (1) (A). The petitioners had the burden of proving error in that determination. The findings above show nothing on the subject, but the stipulation (adopted as findings) is that each of the four men "forwarded declarations of estimated tax for the year 1948 to the collector of internal revenue in March, 1948 * * * for estimated income of zero for said period." Those documents were not accompanied by the payment of any estimated tax for 1948.

Section 58 (a) (2), as applicable to these petitioners for the year 1948, required each to "make a declaration of his estimated tax for the taxable year if—* * * (2) his gross income from sources other than wages (as defined in section 1621) can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more."

Section 58 (a) also required later filing of the declaration of estimated tax up to January 15, 1949, if the requirements for filing were first met later in the year.

No facts are found to show why the petitioners filed the zero estimates "in March, 1948." No declaration is required on an honest estimate of zero income. However, the duty of each did not end there, even if he was acting honestly, because he was required by law to make and file the estimate later if, after March 1, 1948, for the first time it could have been reasonably estimated that his gross income from other than wages would exceed $100 and his gross income would be $600 or more.

Each of these taxpayers had non-wage income for 1948 far in excess of $100 and had gross income far in excess of $600. There is no proof in this record that any one of them could not have estimated reasonably at some time during the year 1948 or prior to January 15, 1949, that his income would have been substantial. There is no showing that during March, when they filed the so-called declarations, it would not have been reasonable on the part of each one of them to have estimated that he already had or would have a substantial amount of taxable income on which he was required under the law to make an honest declaration of estimated tax and pay a portion thereof at the time of filing the declaration. Obviously it was apparent to each one of them before January 15, 1949, the last date for filing a declaration of estimated tax for 1948, that each had had substantial income and was liable for a substantial amount of tax. None ever filed any further declaration.

The evidence indicates to me that these petitioners have flaunted the requirements of sections 58 and 294 (d) (1) (A). The zero declarations were not the required declarations. The majority Opinion in recognizing their zero declarations as avoiding additions to the tax provided by the latter section, has exaggerated a form over the substance required and has allowed these taxpayers to frustrate the intent of Congress in regard to the current payment provisions of the statute and substantially emasculates the provisions of section 294 (d) (1) (A) which provides that:

In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * * For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35.

Those provisions are entirely aside and in addition to those provided for substantial underestimate of estimated tax contained in section 294 (d) (2). I think the petitioners in this case have failed to overcome the presumption of correctness attaching to the Commissioner's determination that the zero declarations which they filed in March 1948 were not declarations within the meaning of sections 58 and 294 (d) (1) (A). Cf. *Ferrando* v. *United States*, 245 F. 2d 582.

I agree with the majority on all other issues.

PIERCE, *J.*, agrees with this dissent.

---

BRUCE, *J.*, dissenting: I concur in the Opinion of the Court with respect to all of the issues except the first, which relates to the determination of the taxable income derived by each of the petitioners from the Jungle Novelty Company, a partnership engaged in conducting a gambling casino, during the years 1948 and 1949. With respect to that issue I respectfully dissent. As the trial Judge who presided at the hearing, however, I wish to make it clear that I disagree with the views of the majority principally with respect to the theories by which they have arrived at their conclusions and not as to any evidential matters depending upon the credibility of the witnesses. Specifically I wish to affirm that I do not accept as credible the self-serving and uncorroborated testimony of the petitioners as to the correctness of their books or that the slips, which were made available to the attorney-bookkeeper, and on the basis of which he kept the books of the partnership, accurately set forth the results of their daily computations showing the amounts won or lost by the partnership.

With respect to the first and principal issue, it is my view that the majority Opinion does not squarely meet the contentions of the petitioners. To the extent the majority hold that petitioners have not established that the determinations made by respondent are not arbitrary and to be disregarded, I disagree.

As I understand them, petitioners' contentions, both at the hearing and on brief, are: (1) That respondent was not justified in disregarding the partnership books and returns and in computing the taxable income by some other method; (2) that the method employed by respondent is unreasonable and the deficiencies determined by him arbitrary, without foundation in fact, and invalid; and (3) that where the evidence establishes that the determination of the respondent is arbitrary and invalid, petitioners are not required to show that they owe no tax or the correct amount. Petitioners cite and rely upon *Helvering* v. *Taylor*, 293 U. S. 507; *Durkee* v. *Commissioner*, (C. A. 6)

162 F. 2d 184; *Gaspar* v. *Commissioner*, (C. A. 6) 225 F. 2d 284; and others.

Respecting petitioners' first contention, the books and returns clearly do not reflect the income of the partnership and consequently the income of the individual petitioners.

Certainly, with respect to the horsebook, the partnership had, in the form of the betting slips, a record of the total amount of bets taken each day, which represented its gross receipts from this source. It also had, in the form of the betting slips on which notations were made of the winning bets and the customers' copies of such slips which were turned in by them upon collecting their winnings, a record of the total amount of "wins" paid out. It retained none of this substantiating data and neither made nor retained any other record of such amounts. While the nature of such games precludes the making of a record of each bet placed, the partnership did have, in the form of the results reported by the operators and recorded on an adding machine tape, a record of the daily amounts won or lost from the operations of the poker tables and the dice, roulette, and chuck-a-luck games, and at least twice a week from the slot machines. It retained none of the adding machine tapes which would have shown its gross receipts or losses from these sources, nor any other record of such amounts. The partnership also knew the number of, and price paid for, bingo cards each day which represented its gross receipts from this source. The difference between the amount received and the amount paid out as prizes was also reported to the partnership each day by the operators in charge of that activity, and the amount of gain or loss recorded on the adding machine tape along with that of the other activities.

By recording and reporting only "net winnings" or "net losses" petitioners determined for themselves the amount of their allowable deductions for losses, without any opportunity or possibility of the respondent checking them as the statutes and regulations contemplate he should have. Cf. *Fairchild* v. *United States*, 136 F. Supp. 753, reversed on other grounds (C. A. 5) 240 F. 2d 944. "When a deduction is claimed, the government has an undoubted right to demand a full disclosure of the facts on which the claim is based, for otherwise it would be at the mercy of the unscrupulous taxpayer." *O'Laughlin* v. *Helvering*, (C. A., D. C.) 81 F. 2d 269.

Accordingly respondent was justified in undertaking to compute the income of the partnership and of petitioners by some other method which would clearly reflect the income. Sec. 41, I. R. C. 1939.

With respect to petitioners' second contention, in my opinion they have sustained their burden of proof in overcoming the presumptive correctness of respondent's determination. Although this may not have been done on petitioners' case in chief, it is my view that it was

certainly done when respondent called the revenue agent as his own witness and opened him up to cross-examination. At this point I think the burden of going forward shifted to respondent to establish by competent evidence, the additional facts upon which he relied in arriving at the deficiencies finally determined by him. This he did not do. Our determination is to be made from the entire record.

In the case of the horsebook, respondent's agent first estimated the average amount of bets placed each day on the basis of estimates made by certain employees of the Jungle Inn engaged in that activity. He then estimated that the partnership realized earnings or net winnings equal to 12 per cent of the gross amount bet. By multiplying the average daily take by the known number of days the horsebook operated, he computed what he determined to be the amount realized on the horsebook for each of the years 1948 and 1949. Income from the dice tables was computed on the basis of 10 times the total salaries paid to the employees operating a single dice table. The amount realized from the slot machines was computed by first estimating the average amount placed in the slot machines by players each day. This estimate was based upon estimates given by employees engaged in making change. Respondent's agent then estimated that the machines retained 79 per cent of the gross amount played and that this 79 per cent represented the partnership's net winnings from this activity. Based upon an admittedly arbitrary estimate of the aggregate amount that would be realized over a full year from the operation of the poker tables, roulette, and chuck-a-luck, and the known number of weeks the Jungle Inn was in operation, he computed the amount realized from those three activities during 1948 and 1949. Based upon statements made by certain employees engaged in operating the bingo games, respondent's agent concluded there was no profit or loss by the partnership from this activity. Respondent determined the partnership net income for 1948 and 1949 by adding the estimated profits on the various activities and subtracting the total amount of expenses claimed by the partnership.

The formulas, 12 per cent of gross amount bet for computing winnings on the horsebook, 79 per cent of gross amount played for computing winnings from the slot machines, and 10 times salaries paid for computing winnings from the dice games, were furnished respondent's agent by his supervisor, the bases for which were unknown to the agent and are not disclosed by the record herein. Cf. *Morris Nemmo*, 24 T. C. 583, on appeal (C. A. 6) ; *H. T. Rainwater*, 23 T. C. 450.

Undoubtedly, because of the lack of adequate records maintained by the partnership or by petitioners individually, respondent was faced with a difficult task of determining with reasonable accuracy the income of the partnership and of petitioners. Lacking informa-

tion on which he could predicate any other method, such as the net worth and bank deposits methods, respondent resorted to the method described above. While no particular method is prescribed, the method adopted must be one that will clearly reflect the income, *Bradstreet Co. of Maine* v. *Commissioner*, (C. A. 1) 65 F. 2d 943, reversing in part 23 B. T. A. 1093, and, as stated in *Mount* v. *Commissioner*, (C. A. 2) 48 F. 2d 550, "[t]here must be a limit beyond which the presumptive correctness of the Commissioner's determination may not be stretched in order to defeat a taxpayer."

Considering all the facts and circumstances presented herein, I would hold that the method adopted by respondent is not reasonable and that the deficiencies determined by him are without foundation in fact, and therefore to be disregarded. *Helvering* v. *Taylor, supra; H. T. Rainwater, supra.*

See also *Thomas* v. *Commissioner*, (C. A. 1) 232 F. 2d 520; *Gaspar* v. *Commissioner, supra; Thomas* v. *Commissioner*, (C. A. 6) 223 F. 2d 83; and *Wilson Coal Land Co.* v. *Commissioner*, (C. A. 4) 87 F. 2d 185, in each of which Memorandum Opinions of this Court were reversed and the cases remanded for further proceedings; and *Durkee* v. *Commissioner, supra,* remanding 6 T. C. 773.

I do not agree with petitioners' third contention, however. Although, in my opinion, petitioners have sustained their burden of overcoming the presumptive correctness of respondent's determination, the deficiencies determined by respondent are merely to be disregarded. The question remains whether, on the basis of the evidence presented, petitioners are liable for any deficiencies in income tax and, if so, how much.

The majority Opinion has arrived at certain amounts which they say represent net income received by the partnership from the various gambling activities. I would employ a different approach and arrive at somewhat different amounts which, to me, are more readily supportable.

It is well established that where a taxpayer seeks a deduction, the burden is upon him to prove not only that he is entitled to it but also the amount of it. *Burnet* v. *Houston*, 283 U. S. 223; *Helvering* v. *Independent Life Ins. Co.*, 292 U. S. 371; *New Colonial Co.* v. *Helvering*, 292 U. S. 435. See also *Helvering* v. *Taylor, supra,* wherein, after referring to the burden upon the taxpayer, in a suit to recover taxes paid, to show the amount to which he was entitled, the Supreme Court said: "For like reason the burden is upon the taxpayer to establish the amount of a deduction claimed." Accordingly the burden was upon the petitioners to establish not only the right to deduct the "losses" sustained in the gambling operations of the partnership but the amount thereof. The self-imposed impossibility of proving

the material facts upon which the claim rests does not relieve the taxpayer of his burden of proof. *Burnet* v. *Houston, supra.*

In their individual income tax returns petitioners set forth their distributive shares of the net income shown on the partnership returns. The partnership returns reported as gross receipts at line 1 under the general heading "GROSS INCOME" the amounts of $435,242 and $355,258, respectively, for the years 1948 and 1949. The same figures were set forth, at line 13 under the same general heading, as its total income. Under the general heading "DEDUCTIONS," at lines 14 to 24, inclusive, were set forth expenses, such as wages, rent, taxes and licenses, utilities, supplies, race wires, and cab fares, totaling $303,032 and $259,597, respectively, for the years 1948 and 1949. The net income reported by the partnership for the years 1948 and 1949 was $132,210 and $95,661, respectively.

The amounts returned as gross receipts in fact represented the difference between the total winnings and losses as shown on the books maintained for the partnership by the attorney-bookkeeper. The books for the year 1948, having been destroyed in the raid conducted by the State officials on August 12, 1949, are not available. The books for the year 1949, however, are available and were made a part of the record herein. These books show that the partnership had total winnings during the year 1949, *at least* in the amount of $424,766. The partnership books for the year 1949 also set forth as losses the total amount of $69,508. It is the difference between these two figures ($424,766 less $69,508 equals $355,258) which the partnership reported as its gross receipts and gross income for the year 1949. When considered together, it is clear from the partnership books and returns that petitioners are claiming the right to deduct the sum of $69,508, as gambling losses, for the year 1949.

Section 23 (h) of the Internal Revenue Code of 1939 provides that, in computing net income, losses from wagering transactions, to the extent of the gains from such transactions, shall be allowed as deductions from gross income. Respondent has not questioned the right of petitioners to deduct gambling losses but does contend that petitioners have not sustained their burden of establishing the amount of such losses. In this respect I agree with respondent.

The total winnings of the partnership for the year 1949 were at least $429,970.70. This is the figure shown on its books (which may be treated as an admission against interest), plus $5,204.70 found in the slot machines when seized by the State officials. In finding such amount I am aware of the fact that, due to the practice of deducting losses from winnings, or vice versa, and entering on the books only the resulting difference, the total winnings could well have been, and probably were, larger.

The question of the amount of losses sustained by the partnership is essentially one of fact to be determined from the entire record. *H. T. Rainwater, supra.* I do not doubt that the partnership sustained some losses with respect to the horsebook and perhaps, on some occasions, with respect to bingo, dice, chuck-a-luck, and roulette. Since its take from the poker tables was a percentage of each "pot," it sustained no losses from that activity and it is extremely doubtful that the slot machines ever showed a loss on any day of operation. Implicit in the partnership's method of bookkeeping is the fact that it offset an unknown amount of claimed losses for every day of operation, both on days when its books listed only net winnings and on the days when they listed only net losses. It would serve no useful purpose to repeat the facts here. It is sufficient to say that having carefully considered all the evidence presented, for the reasons heretofore discussed, I find it insufficient to establish, even under the *Cohan* rule (*Cohan* v. *Commissioner*, (C. A. 2) 39 F. 2d 540), the amount of losses, if any, sustained by the partnership in excess of those thus taken. In so doing I give no weight to the self-serving and uncorroborated testimony of the petitioners as to the correctness of their books.

In summary, I would find and hold that, during the year 1949, the partnership, Jungle Novelty Company, received as winnings from gambling operations the amount of at least $429,970.70; that the evidence is not sufficient to establish the amount, if any, of its gambling losses in excess of those implicitly taken; that it incurred expenses in the amount of $259,597.75; and that its net income distributable to the petitioners in proportion to their respective partnership interest was $170,372.95.

The situation with respect to the year 1948 is somewhat different from 1949, due to the fact that the partnership books maintained by the attorney-bookkeeper for 1948 were not available. It is possible, however, to make a reasonably accurate estimate with respect to winnings and the amount claimed as losses from the evidence available and by comparison with the operations for 1949. The evidence shows that for 1948, as in the case of 1949, the amount shown on the partnership return as gross receipts represents the amount of its winnings after deduction of its claimed losses. The average weekly net income reported on the partnership returns was $2,938 for 1948 ($132,210 divided by 45), and $2,989 for 1949 ($95,661 divided by 32), or substantially the same for each year. The average weekly income reported for 1948 was $9,682 ($435,242 divided by 45), and for 1949 was $11,102 ($355,258 divided by 32). This difference could have resulted from the taking of greater losses in 1948 than 1949, especially since it is noted the average weekly expenses reported for 1948 ($303,-

032 divided by 45 equals $6,734) was less than those for 1949 ($258,-597 divided by 32 equals $8,081). The average weekly losses claimed for the year 1949 were $2,172 ($69,508 divided by 32). It is reasonable to assume that the average losses taken for 1948 were at least $2,000 per week, and that the total winnings for the 45 weeks the partnership operated in 1948 were at least $525,242 ($435,242 plus $90,000).

In summary, I would find and hold that, during the year 1948, the partnership, Jungle Novelty Company, received as winnings from gambling operations the amount of at least $525,242; that the evidence is not sufficient to establish the amount, if any, of its gambling losses in excess of those implicitly taken; that it incurred expenses in the amount of $303,032; and that its net income distributable to the petitioners in proportion to their respective partnership interests, was $222,210.

As previously indicated, I concur in the Opinion of the Court with respect to all the issues except the first. For the reasons stated above I respectfully dissent with respect to the first issue.