William Copeland v. Commissioner.
Copeland v. Commissioner
Docket No. 77528.
United States Tax Court
T.C. Memo 1962-140; 1962 Tax Ct. Memo LEXIS 170; 21 T.C.M. (CCH) 737; T.C.M. (RIA) 62140; June 7, 1962
*170 Donald Steinberg, Esq., and Joseph Steinberg, Esq., for the petitioner. Paul D. Barker, Esq., and Rudolph J. Korbel, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax - I.R.C. 1939
Sec. 294
Year
Tax
Sec. 293(b)
(d)(1)(B)
Sec. 294(d)(2)
1945
$22,961.36
$9,918.18
$277.50
$1,159.14
1946
7,721.51
4,127.95
632.12
1947
12,085.29
6,042.65
764.21
The issues for determination are: (1) Whether respondent's determination of income by the use of the increase in net worth plus expenditures method correctly reflects the true taxable income of the petitioner for the taxable years 1945, 1946, and 1947, and whether the deficiencies so arrived at are due to fraud with intent to evade tax, and (2) whether petitioner is liable for the additions to tax under section 294(d)(1)(B) and section 294(d)(2), I.R.C. 1939, for the years 1945, 1946, and 1947. Respondent has conceded that the statute of limitations precludes the determination of the deficiencies in income tax unless it is proved that *171 the returns filed were fraudulent with intent to evade tax within the meaning of section 293(b), I.R.C. 1939. Findings of Fact Some of the facts have been stipulated. The stipulations, including the facts appearing in the stipulated exhibits, are hereby found. Petitioner is an individual who has resided with his wife since 1942 at 200 West 86 Street, New York, New York. He married the former Mattie Dreese, on June 30, 1929. His individual cash basis tax return for the year 1945 was filed with the collector of internal revenue for the fourteenth district of New York at Albany, New York, and his individual tax returns for the years 1946 and 1947 were filed with the collector of internal revenue for the third district of New York at New York, New York. Petitioner had been engaged in the occupation of "betting commissioner," more commonly known as bookmaker, for a number of years prior to 1945. On April 18, 1945, petitioner and two associates formed a bookmaking partnership known as Copeland Associates (hereinafter called the partnership), located at 368 South Broadway, Yonkers, New York. The partners and their distributive shares were as follows: Petitioner
50 percent
Benjamin Kutlow
25 percent
Morris Lewis
25 percent
*172 Petitioner's initial capital contribution to the partnership was not less than $5,000. Partnership returns, Forms 1065, were submitted for the partnership for the taxable year April 18, 1945 to December 31, 1945 and calendar years 1946 and 1947 to the collector of internal revenue for the fourteenth district at Albany, New York. These partnership returns showed cash basis net income of $25,061.20, $40,976.42, and $37,913.81 for the years 1945, 1946, and 1947, respectively, and contained the following year-end balance sheet information: Assets
1945
1946
1947
Cash
$42,484
$51,162
$52,463
Receivables
51,380
22,698
26,242
Loans receivable
12,100
Other assets
2,200
1,900
1,043
Total assets
$96,064
$75,760
$91,848
Liabilities
Payables
$61,582
$20,838
$16,155
Accrued expenses
546
1,034
521
Partners' capital ac-
counts: Petitioner
17,156
25,793
35,306
Morris Lewis
8,390
10,340
16,507
Benjamin Kutlow
8,390
17,756
23,359
Total liabilities
$96,064
$75,761
$91,848
The partnership was operated from varying locations in the New York metropolitan area. Petitioner worked at the partnership's place of business on a full-time *173 basis. He and the other partners and employees would accept bets placed by telephone on horse racing and other athletic events and would "lay off" the bets with gambling syndicates throughout the United States. These transactions were recorded on separate 3 X 5 slips of paper which were collected by an employee at the end of each day and taken to the partnership's bookkeeper, who recorded them in the partnership's books. Quarterly, a certified public accountant would audit the partnership's books and prepare the necessary payroll returns. The partnership's bookkeeper kept a complete set of books and records, consisting of accounts receivable, accounts payable, cash receipts journal, general journal, and general ledger. Petitioner knew little about the partnership books, none of which was in his custody, and did not concern himself with that aspect of the business. A New York State examination of the partnership's income tax returns for the years 1945, 1946, and 1947 resulted in a finding of no unreported income. During the years 1942 through 1945 petitioner and Mattie Copeland purchased series E and F United States Savings bonds costing as follows: 1942-1944, $12,037.50; 1945, *174 $675.00. These bonds were held in the names of petitioner, or Mattie Copeland, or their joint names were held by them throughout the taxable years. Petitioner and his wife submitted separate sworn statements to respondent's agent stating that they had purchased $60,000 of United States Treasury bonds in or shortly before 1944. This purchase was denied by both at the trial. Of the $57,000 face amount of United States Treasury bonds sold by petitioner in 1952, on April 10, 1952, the Central National Bank of Yonkers sold for petitioner: (1) $2,000 of 2 1/2 percent 1965-70 United States Treasury bonds which were originally subscribed for on January 26, 1944 from The Morris Plan Industrial Bank of New York and were part of a total subscription of $19,000; and (2) $25,000 of 2 1/2 percent 1967-72 United States Treasury bonds which were originally subscribed for on June 29, 1945 from the Central National Bank of Yonkers. And on February 20, 1952, the Central National Bank of Yonkers sold for petitioner $30,000 of United States Treasury bonds, 2 1/4 percent, 1959-62, which were originally subscribed for in undetermined amounts from among the following bond subscriptions: Date of sub-
Bonds sub-
Total sub-
scription
Name of Bank
scribed for
scription
May 28, 1945
National Safety Bank & Trust Co. of New York
2 1/4%
$112,000
1959-62
May 31, 1945
National Safety Bank & Trust Co. of New York
2 1/4%
85,000
1959-62
June 28, 1945
National Safety Bank & Trust Co. of New York
2 1/4%
127,500
1959-62
*175 Included in the May 28, 1945 total is one bond of $5,000 purchased by one H. Kemp, 1370 Broadway, New York. The June 29, 1945 purchase of $25,000 was by one Dave Weiss, Yonkers, New York, who died some time between 1950 and 1960. Petitioner submitted an affidavit to the New York State Tax Commission stating that his weekly salary between the years 1929 and 1943 ranged from $50 to $100 per week. He also submitted an affidavit to the Commission in 1945 requesting permission to pay $614.95 in full settlement of his New York State taxes for the years 1928 to 1935, stating in this affidavit that an assessment in the amount of $311.70 for the years 1935 to 1940 was paid at the rate of $17.50 per month. Petitioner filed a New York State income tax return for 1944 in which he reported income in the amount of $13,026.77. Respondent subpoenaed the partnership books and records from petitioner for the instant trial. Petitioner replied that he had never seen the books and records and did not know where they were. On his Federal income tax return for the calendar year 1949, petitioner reported $1,502 interest income. Other than in 1945, when petitioner reported $80 as income from interest *176 and dividends, his returns for the years 1945 through 1948 show no income from interest. Petitioner took combination business and pleasure trips to Florida in 1945 and 1947, taking his wife with him both times. In 1946 petitioner and his wife vacationed in Hot Springs, Arkansas. During the taxable years, petitioner's mother-in-law lived with petitioner and his wife. They ate their evening meals at home and employed a maid once a week. During 1946 and 1947, petitioner was ill with bleeding ulcers. Petitioner's personal living expenses totaled $12,168.36, $11,344.16, and $18,145.09 for 1945, 1946, and 1947, respectively. Respondent determined the deficiencies for the taxable years 1945 through 1947, inclusive, by employment of the net worth plus nondeductible expenditures method of computing income as follows: Computation of Additional Income by Net Worth Method
Assets:
1/1/45
12/31/45
12/31/46
12/31/47
U.S. Savings Bonds (cost)
$12,037.50
$12,637.50
$12,637.50
$12,637.50
U.S. Treasury Bonds
$30,000 - 2 1/2
1959/62
$27,000 - 2 1/2
1965/70
Total cost apportioned 1945-1948
14,250.00
28,500.00
42,750.00
Capital account in partnership Copeland
Association
17,155.60
25,792.66
35,306.26
Total Assets
$12,037.50
$44,043.10
$66,930.16
$90,693.76
Liabilities
Net Worth
$12,037.50
$44,043.10
$66,930.16
$90,693.76
Less: Net worth at end of preceding year
12,037.50
44,043.10
66,930.16
Increase in net worth
$32,005.60
$22,887.06
$23,763.60
Plus: Personal living expenditures and other un-
allowable amounts paid
13,368.36
12,544.16
19,345.09
Total
$45,373.96
$35,431.22
$43,108.69
Less: Adjusted gross income per returns
14,135.50
21,613.21
22,156.91
Additional income
$31,238.36
$13,818.01
$20,951.78
*177 The following schedule represents respondent's computations for "Personal living expenditures and other unallowable amounts paid," included in his net worth statement: Statement of Personal Living Expenditures
1945
1946
1947
Insurance
$ 687.16
$ 687.16
$ 687.16
Rent
1,800.00
1,800.00
1,800.00
Clothing
100.84
2,469.62
Federal income taxes
2,106.58
2,482.56
6,029.44
Contributions
500.00
2,057.63
2,635.00
N. Y. State income tax
259.64
185.97
428.87
Miscellaneous taxes
20.00
30.00
95.00
Medical expenses
2,794.98
Food, vacations and other expenses
not included above
5,200.00
5,200.00
5,200.00
Total
$13,368.36
$12,544.16
$19,345.09
The figure of $14,250.00 added to each of the taxable years represents the determination of respondent's agent of what he considered to be the appropriate years to which to allocate the purchase of $57,000 of bonds sold for petitioner in 1952. As of January 1, 1945, in addition to the $12,037.50 allowed by respondent as petitioner's opening net worth, petitioner had not less than $5,000 of additional assets and Mattie Copeland, petitioner's wife, had at her disposal not less than $20,000 *178 of additional assets. For the years 1945, 1946, and 1947 petitioner did not file false or fraudulent returns with the intent to evade tax within the meaning of section 293(b), I.R.C. 1939. Opinion It is well settled that fraud is never presumed but must be proved by respondent by clear and convincing evidence. L. Glenn Switzer, 20 T.C. 759 (1953); Abraham J. Muste, 35 T.C. 913 (1961). Respondent has sought to prove fraud by the net worth plus nondeductible expenditures method of income reconstruction. Under proper circumstances such a method can constitute proper proof of fraud. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1954). However, before it will support a finding of fraud, a net worth statement must bear close scrutiny. A mere glance at respondent's net worth statement shows that it fails to survive such a test. The following assumptions in respondent's favor would have to be made in order for us to conclude that the unreported income for the 3 years before us had been received by petitioner: 1. Aside from savings bonds of $12,037.50, petitioner and his wife were without assets *179 at the beginning of the taxable period. 2. Of the $57,000 of U.S. Treasury bonds sold for petitioner in 1952, $42,750 was purchased by petitioner during 1945-1947. 3. Of the $42,750 allegedly purchased by petitioner during 1945-1947, the amount of $14,250 of these bonds was purchased in each of the 3 taxable years. 4. None of petitioner's partnership capital account was composed of invested capital. 5. The total partnership capital account balance, which includes receivables, properly represents income to a cash basis partnership and, in turn, to petitioner. 6. In addition to the extensive personal expenses itemized in respondent's net worth computation, petitioner spent an additional $5,200 for nondeductible expenses in each of the years before us. The evidence needed to support these assumptions is lacking. The $57,000 of Treasury bonds sold for petitioner in 1952 cannot be allocated to the 3 years before us. All of it could have been purchased in 1948. An illustration of the fallacy of respondent's approach to the bond purchases may be gathered from combining three statements in his reply brief on three succeeding pages: * * * In an effort to negate any arbitrariness *180 which might result from attributing all the Treasury bonds to one year and because it appeared that some purchases could have been made in 1948, as well as the years herein involved, the $57,000 worth of Treasury bonds were allocated over the period 1945-1948 * * * and * * * The evidence disclosed an unascertainable amount was purchased by the petitioner in each of the years 1945-1948. The year 1948 was closed by previous agreement with the petitioner without changes in the allocation of bonds to that year. and Respondent submits that if the Court believes the Treasury bond purchases occurred entirely in one year * * * and the fraud might have been perpetrated solely in that period, then the respondent's determination should be upheld for that year * * * Respondent is thus saying that, for all that appears from the evidence, the entire $57,000 of the bonds could have been purchased in one year and that that year could have been 1948, a year which is not before us. Whether there were or were not understatements of income in that year, the present record can hence admittedly be of no assistance to respondent in proving by clear and convincing evidence that there was fraud in *181 the years in controversy, even giving to the evidence of petitioner's involvement in the bond purchases such weight as we think warranted. And in any event, an arbitrary allocation of the bond purchases among any group of years is a totally unacceptable method of proving fraud. Respondent must not only prove income but must also prove that it is currently taxable income, Holland v. United States, supra; and, further, he must attribute it to its proper taxable year. As we said in W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958): The basic fallacy in respondent's approach to the merchandise inventories and accounts receivable is that there are no grounds for assuming that they increased in the rigid, precise fashion of an arithmetical progression. The increase in these assets may have occurred entirely in one year and the fraud might have been consummated solely in that year. In such a situation, there is no justification for spreading the deficiencies and fraud penalties over a period of years. One of the fundamentals of our income tax system is the annual accounting concept and, although the net worth method of determining *182 an individual's taxable income may result in some slight deviation from this because of the approximations inherent in a net worth computation, there is no authority in the Code for a complete disregard of the principle that each year is a separate taxable unit. Where the issue is fraud, we cannot assume that such fraud occurred in each of the years in issue rather than solely in one. In addition, no evidence has been produced to support respondent's unreasonable position that petitioner had no opening net worth other than savings bonds, especially since in 1944 he had an interest in another bookmaking establishment and invested $5,000 in the partnership in April 1945. Petitioner's partnership account, which respondent added to the net worth statement, reflects petitioner's one-half interest in the partnership assets which, for balance sheet purposes, was computed on an accrual basis and is composed of receivables in excess of payables in the amount of $21,666 as of the end of the taxable period. This does not all represent income in respect to a cash basis partnership and thus can not summarily be added to petitioner's net worth for the purpose of arriving at unreported income. *183 The excess of receivables will only be reportable income when received and to that extent could not represent unreported income. The total unreported income upon which respondent's determination is based for the 3 years in issue is approximately $66,000. If from this we deduct $42,750 of Treasury bonds improperly allocated by respondent to the taxable years, the approximately $11,000 excess of the cash basis partnership's receivables over its payables also erroneously added to the net worth statement, the $3,600 which we have determined to be excess personal expenses also added by respondent, and the $5,000 capital in the partnership, what remains would be only $3,650 of unreported income for the 3 years, or about $1,200 if spread evenly, without even considering what we think is an inadequate opening net worth allowed petitioner. Since there is no adequate proof to support the necessary assumptions and since, without them, there is no proof of substantial or repeated unreported income, we must conclude that respondent has failed to sustain his burden of showing by clear and convincing evidence, or, indeed, in many instances, by any evidence whatever, that the understatements of *184 income claimed by him, or any significant understatements of income, can be attributed to petitioner for the years in controversy. Respondent also maintains that, even eliminating the $14,250 bond allocation from each of the taxable years, there exists substantial unreported income for the year 1945. Even assuming, contrary to our findings, that such unexplained income exists for 1945, a showing of unreported income alone, Holland v. United States, supra, and not even a pattern of unreported income, Furnish v. Commissioner, 262 F. 2d 727 (C.A. 9, 1958), affirming this point 29 T.C. 279 (1957), is insufficient to prove fraud, John Marinzulich, 31 T.C. 487 (1958). We accordingly arrive at the factual conclusions, partly because of respondent's failure to support his burden of proof, partly because of the inferences which we think may affirmatively be gathered from the record, that petitioner's opening net worth combined with that of his wife was in excess of respondent's figure by not less than $25,000, that petitioner's living expenses for the 3 years were less than estimated by respondent by $3,600 for the 3 years in question, *185 and, for the reasons previously set forth, that no part of the bonds can be found to have been purchased in the years in controversy. Against the $66,000 of allegedly unreported income, there are, accordingly, offseting items of over $70,000 in addition to the $11,000 of excess receivables attributed to petitioner on the partnership books at the end of the period. Even if, in some respects or to some degree, our conclusions on the evidence are slightly inaccurate, there is so much latitude left that we think it entirely clear that respondent's determination of fraud cannot be sustained. And without concluding that fraud exists, there can concededly be no approval of the deficiencies in tax. Petitioner's motion for judgment made after the close of the trial accordingly requires no further action. Respondent also determined deficiencies in additions to tax under section 294(d)(1)(B) for failure to pay installments of estimated tax, and under section 204(d)(2) for substantial underestimations. These issues are in hopeless confusion. They are not mentioned to any extent in petitioner's briefs; and in respondent's argument, he refers to section 204(d)(1)(A). We may assume that some part, *186 at least, of the additions for underestimation were founded on respondent's assumption of unreported income, but as to both sections, the burden of proving reasonable cause and lack of willful neglect is placed upon petitioner. See Anthony Delsanter, 28 T.C. 845, affd. 267 F. 2d 39 (C.A. 6, 1959). No evidence whatever was produced in this respect. Cf. Harold C. Marbut, 28 T.C. 687, 691 (1957). Accordingly, for the purpose of computing whatever additions to tax, if any, may be due under section 294. Decision will be entered under Rule 50.