ESTATE OF ROGER SIMKINS, Deceased, YVONNE SIMKINS, ADMINISTRATRIX, and YVONNE SIMKINS, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Estate of Simkins v. Commissioner
Docket No. 3216-74.
United States Tax Court
T.C. Memo 1978-338; 1978 Tax Ct. Memo LEXIS 176; 37 T.C.M. (CCH) 1388; T.C.M. (RIA) 78338; August 28, 1978, Filed *176 Roger V. Barth,Robert J. Bird, and Paul S. Richter, for the petitioners. Charles B. Norris, and Thomas C. Morrison, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency of $ 346,897.56 in petitioners' Federal income tax for the taxable year 1970 and an addition to tax under section 6653(a)[1] of $ 17,344.88. The parties have presented five issues for our determination: (1) Whether respondent's audit and the determination in the notice of deficiency were so arbitrary and capricious as to deny the notice of deficiency its usual presumption of correctness. (2) Whether, and to what extent, petitioners failed to fully report their taxable income from numbers activities on their joint 1970 Federal income tax return. (3) Whether the section 6653(a) addition to tax for "negligence or intentional disregard of the rules and regulations" should be imposed. (4) Whether petitioner Yvonne Simkins is an "innocent spouse" entitled to relief under section 6013(e). (5) Whether petitioners have been denied due process *177 of law. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Roger W. Simkins, Sr., (hereinafter Simkins) was born on February 15, 1899, and married petitioner Yvonne Simkins (hereinafter Yvonne) in July 1945. They have two children, Roger and Lorilyn. Simkins died on July 15, 1973. Yvonne and Simkins timely filed a joint Federal income tax return for 1970. Yvonne is administratrix of her husband's estate. She appears in this case as a party-petitioner both in a representative capacity on behalf of the estate, and individually on her own behalf. Yvonne resided in Washington, D.C. at the time petition in this case was filed. Simkins, who was also known as "White Top" Simkins, had a record of gambling related convictions arising out of the conduct of illegal lotteries dating back to 1935. In 1954 he was arrested with several other individuals and convicted of bribery related offenses. Monroe v. United States,234 F.2d 49 (D.C. Cir. 1956), cert. denied 352 U.S. 873 (1956). As a consequence, he was sentenced to prison, and released on parole on December 17, 1959, soon after it was *178 discovered that he suffered from cardiac problems in addition to a mild case of diabetes. From 1960 through and including 1970 he was employed as an automobile salesman in the Washington, D.C. area. Simkins was not arrested after his release on parole until March 26, 1970.However, he continued to be involved in illegal lottery operations commonly referred to as the "numbers." A numbers operation is essentially a betting game in which an individual (bettor) bets money on a number, usually a three-digit number. During 1970, Washington, D.C. numbers operations were run in the following manner: Numbers operators chose the winning numbers based on the pari-mutuel payoffs on three different horse races at local race tracks. The results of each race supplied a different digit constituting the three-digit number. Bettors commonly knew which races were used for this purpose. Because of its accuracy, a periodical commonly called an "Armstrong Scratch Sheet" (which listed the pari-mutuel payoffs at various racetracks around the country) was read by numbers operators as well as the betting public to determine the winning numbers. These winning numbers could range between 000 and 999 inclusive *179 so that the odds of correctly selecting the winning number were one in 1,000. A new winning number was chosen each day except for Sunday when no number was chosen. Bettors placed their wagers with writers who wrote down the number bet and generally received the amount bet immediately in cash. The amount wagered most commonly ranged between $ 0.25 and $ 1 with bets as large as $ 10 being quite rare. Sometimes the bettor would place a "keep in" bet. This meant that an amount was to be bet on a number for several consecutive days. Numbers writers, after collecting several bets, transmitted the numbers and amounts bet thereon to the office of a numbers backer. This information would be transmitted either by telephone or through a runner employed by the numbers backer. At the office, employees of the backer wrote down the bets submitted by the writers usually using code names for each writer. It was their duty to tabulate the amount of bets each writer took in, the numbers bet and the total amount bet on each number. Frequently the amounts bet by various bettors on a single number would be so large the backer would be faced with a significant loss should it be the winning number for *180 the day. To insure against such loss, the backer would "lay off" part of that amount with another person commonly called a lay off operator. If the number so laid off won, the lay off operator paid at odds of 850 to 1 enabling the backer to pay the individual bettors without an overall loss. If the number laid off did not win, the backer paid the lay off operator the amount laid off. Lay off operators took lay off bets through an office which functioned similarly to that run by backers. The amount received by a winning bettor varied depending upon the number bet. For most numbers, he was paid $ 600 for each dollar bet. This constitutes real odds of 599 to 1. But, because some numbers tend to be bet by the public more often than others, the amount paid on about one-third of the numbers was only $ 400 for each dollar bet or sometimes even less.These were called "cut numbers." Persons involved in running gambling operations commonly carried cards referred to as "cut cards" listing these cut numbers. Because of such numbers, only 52 to 54 percent of the gross amount of money bet was repaid to winning bettors. Numbers writers retained the money given them by bettors until after the *181 winning number for the day had been determined. Then they determined whether any of the bets placed with them had won, and if so, they normally paid the winners from the proceeds of the bets collected. If these proceeds proved insufficient, the backer supplied the necessary funds. Writers received a commission for their activities amounting to 30 percent of the bets placed with them. They were required to pay their backers the gross amount of money bet with them less their 30 percent commission and less "hits" (amounts paid out for winning numbers). Normally writers paid the amount owed their backers on a weekly basis. However, some writers were required to settle accounts in cash on a more frequent basis. Lay off operators tended to be individuals possessing experience in the numbers business, and frequently also operated as backers for various writers. They functioned in a capacity similar to that of a reinsurer for backers. Their profit ratio before expenses amounted to 15 percent of the gross amount laid off. They normally settled with backers on a weekly basis, although sometimes balances were carried a bit longer because of the greater certainty of collection. Office personnel *182 and others employed by backers and lay off operators worked for them on a salary basis. The extent to which backers and lay off operators actively directed the day to day functions of their office personnel varied greatly. In some cases their contact with the office was relatively infrequent.
Throughout the 1960's and 1970, numbers operations were illegal under various Washington, D.C. statutes. Income from such operations most often took the form of cash. In 1957 Yvonne and Simkins were audited with respect to their joint Federal income tax returns for the years 1953 through 1956, inclusive. At this time, Yvonne first employed Leon Bookman (Bookman) to represent them during the audit. Bookman was and is a certified public accountant. The 1957 audit was settled by the adoption of a gross receipts and gross expenditure method. By this method, estimated cash living expenses were added to taxable gross receipts to determine taxable income. From this figure, allowable deductions were taken to arrive at net taxable income. This method resulted in a net increase in tax liability for the 4-year period of $ 3,136.11. This was based on an agreement as to net income in the following *183 amounts for the following years: Year
Net Income
1953
$ 15,590.43
1954
28,868.94
1955
18,874.06
1956
19,583.39
Thereafter, Bookman was employed to prepare petitioners' joint Federal income tax returns for the years 1957 through 1970, inclusive. He consistently prepared these returns on the same basis used to settle the 1957 audit. In preparing these returns, he dealt exclusively with Yvonne, and received all his information from her. Net gambling income (from illegal numbers activities) was determined in the following manner: After discussing with Yvonne cash payments made during the year, Bookman attempted to ascertain petitioners' additional living expenses based on the formula used during the 1957 audit. The amount of additional living expenses paid in cash as thus computed was assumed to equal Simkins' net gambling income. This income was then combined with rental income, and the sum was listed on Schedule C of their Federal income tax returns. Gross gambling income, gambling expenses, and other gambling related deductions were never listed on the returns, nor was Schedule C income ever segregated so that the amount of reported income attributable to Simkins' numbers activities, as distinguished *184 from that due to rentals, could be determined. By contrast, legal gambling income was reported in 1970 on line 39 of Form 1040 where it was designated "Race Track Winnings Hialeah." For the years 1957, 1958, and 1963-70 inclusive, petitioners designated the source of their Schedule C income as "Rentals and Services." For the years 1959-62, they listed the source of such income as "rents." Aside from the reference to the Hialeah race track winnings in 1970, none of petitioners' Federal income tax returns for the period 1957-70 inclusive mention gambling, lotteries, or numbers activities as a source of reported income. In 1969 petitioners used the income averaging method to compute their entire Federal income tax liability, including their liability attributable to the income listed on Schedule C. Petitioners' Federal income tax returns for the period 1957-70 listed the following amounts and sources of income: [SEE TABLE IN ORIGINAL] Year
Wages
Interest
Dividends
Other
Schedule C Gross
Income Net
Adjusted Gross Income
1970
$13,250.00
$3,020.89
$197.00
962.10 a *185 $12,655.11
$5,647.17
$22,880.16
1969
11,700.00
275.57
186.51
$15,083.00 b
16,316.40
10,363.45
37,422.02
1968
7,800.00
862.14
185.40
17,388.50
11,309.16
19,971.30
1967
7,800.00
187.22
167.20
1,858.00 c
18,308.77
12,488.30
22,293.52
1966
7,800.00
647.74
152.00
16,907.98
10,831.28
19,279.02
1965
7,800.00
142.12
144.00
19,025.13
13,441.20
21,383.38
1964
7,950.00
135.74
16,857.39
11,018.25
19,103.99 After the 1957 audit, Bookman again represented petitioners in three subsequent audits covering the years 1961, 1962, 1965-69, inclusive. The audit of the years 1961-62 resulted in an increase in tax liability of $ 77.08 while the latter two audits produced no change in liability. None of these audits was based on an income projection from a collection sheet as was used to determine the deficiency herein. During 1970 petitioners owned several pieces of rental property, all of which were acquired prior to 1955. The Pinkett and the Petite realty companies provided management services for them with respect to their rental properties and regularly submitted statements listing rentals received and expenses paid and enclosed a check for the difference. In preparing petitioners' joint Federal income tax return for 1970, Bookman determined Simkins' numbers related income at $ 7,074.49 using the *186 method described previously. Bookman then determined net rental income by totaling the amounts received by check from the realty management companies. These two amounts were then combined and the sum was entered on line one of Schedule C as gross income from rentals and services. Then, various rental expenses were deducted in arriving at net income from rentals and services. Several of the expenses deducted such as collection commissions, utilities, and repair expenses were listed on the statements the realty management companies sent petitioners and were paid by them out of gross rentals. Bookman's method thus resulted in a double deduction for these items. [2]
For the taxable year 1970 petitioners utilized the cash receipts and disbursements method of accounting. They presented at trial adequate books and records with respect to salary income (in the form of a "W-2" statement), and rental income and expenditures (in the form of comprehensive, detailed, periodic statements provided by the realty management *187 companies). They presented no books or records of any kind with respect to Simkins' numbers activities showing either gross or net income or expenses on either a daily, weekly, or monthly basis. They presented no documentary evidence as to living expenses paid in cash. Although it is customary for income from numbers activities to be received in cash, all deposits in petitioners' checking account during 1970 were in the form of checks. There is no evidence of substantial deposits of cash in the other bank accounts petitioners disclosed on their net worth statement. During 1970, the Washington, D.C. Police Department engaged in an investigation of local illegal numbers operations. As part of this investigation, the police conducted surveillance operations on individuals they had good cause to believe were gamblers. These individuals were observed regularly meeting in a public cafeteria where they spoke together and exchanged large amounts of cash. On one occasion, Officer Malkiewicz observed two of these individuals leave the cafeteria and go to the place where Simkins was employed.On another occasion two of these individuals were followed by Officer Woo from the cafeteria to *188 petitioners' home. One of these was observed entering and then, after a very short period, leaving petitioners' home. On the basis of police observations together with information obtained from a reliable informant, a warrant was issued on March 26, 1970, authorizing the search of petitioners' entire residence for numbers type gambling paraphernalia. This search pursuant to this valid warrant was conducted that same day at 4:30 p.m. by police officer Woo, together with four other officers of the Washington, D.C. Police Department. After the police forced entry into the premises, Simkins ran to the bathroom where he put water soluble paper with writing on it into the toilet.Police were unable to retrieve the paper before it dissolved beyond recognition. Police then took Simkins into custody and searched the premises. Among the items seized were: (1) $ 2,611 in cash and $ 465.30 in checks from a floor safe; (2) a document hereinafter referred to as the collection sheet, which will be described in detail; (3) an "Armstrong Scratch Sheet" dated March 26, 1970, with handwritten marks made by Simkins; (4) numerous numbers slips, several cut cards, and miscellaneous coded telephone numbers; *189 (5) three pieces of paper with codes and figures corresponding to the collection sheet; (6) an electric adding machine; (7) a box of 8 inch X 10 inch water soluble paper; and (8) several firearms. The collection sheet seized by police during the raid was found on top of a desk in a first floor den in petitioners' home. Also on the desk were an Armstrong Scratch Sheet dated March 26, 1970, with Simkins' handwritten marks on it, and a quantity of numbers slips. The collection sheet seized by police was a carbon copy prepared by Rosa Sumter (hereinafter Sumter). It was divided into 9 columns. In the first, fourth, and seventh columns were written code numbers for the individuals who placed wagers with this numbers operation. These were written in Sumter's handwriting as were the numbers written in the second, fifth, and eighth columns. The third, sixth, and ninth columns were largely blank. The letters "Pd" which appear in these columns a total of 14 times, sometime in conjunction with numerical amounts, were added by Simkins. The collection sheet reads as follows: WEEK ENDING - SATURDAY - MARCH 21 [SEE TABLE IN ORIGINAL] The amounts listed in the second, fifth and eighth columns *190 total $ 47,640.30. Sumter worked in the office of Simkins' numbers' operation at 3034 Park Place, N.W., Washington, D.C., when she made this collection sheet. She worked there from sometime in 1969 until the September 18, 1970 raid on that establishment. Her job was to take telephone calls from the persons whose names appear in coded form on the sheet. She wrote down the code name of each caller and his or her bet. The operation at 3034 Park Place was in large part a lay off operation, and most of the individuals listed in code on the collection sheet were large scale gamblers operating as backers for various numbers writers. Sumter prepared the collection sheet by totaling the wagers placed by each code named individual, and then deducting payments made by or on behalf of those persons during the week. The remaining amount (the difference between wagers and payments by each individual) was than placed on the collection sheet next to the individual's code name. It is not clear from the record whether the amounts owed to these persons for having bet on winning numbers were also deducted from the amounts bet before the totals were entered on the collection sheet. Occasionally, amounts *191 still owing from a previous week's activities were also added to the amount, appearing on a current week's collection sheet. However, wagers were normally collected weekly and the collection sheet in question largely reflects amounts resulting from betting activities for the week ending March 26, 1970. Those wagers which were both made and paid during that week were not reflected on the sheet since the current week's payments were deducted from the current week's wagers before any amount was entered on the collection sheet. Each week Sumter sent one copy of the collection sheet to Simkins and another to Charles "Geechie" Anderson (hereinafter Anderson).Anderson had been an employee of Simkins as early as the 1950's. He originally hired Sumter, and both he and Simkins contacted Sumter regularly with respect to the numbers operation. Simkins personally collected approximately 10 percent of each week's proceeds while an individual referred to as "Lucky" collected most the remainder. Also, James "Sunny" Davis was employed in the operation to transmit information. Another paper seized in the den during the March 26 raid also had code names and amounts on it largely in Simkins' handwriting. *192 Of the 18 different code names used, eight appear to match those on the collection sheet. Further, some of the names and amounts listed on the paper correspond to amounts marked "Pd" on the collection sheet. The investigation of gambling activities by the Washington, D.C. Police Department continued after the March raids on Simkins and other gamblers. As part of this investigation, police employed a court authorized pen register intercept [3] on the office telephone of a known area numbers operator. Results of this intercept showed that calls were being placed to telephones located both in petitioners' home, and at 3034 Park Place, N.W., Washington, D.C., which petitioners also owned. Based on this and other information obtained by the police investigation, warrants were issued on Friday, September 18, 1970, permitting the raids on Simkins' home and other suspected gambling locations in the District of Columbia including 3034 Park Place. As a result of the search of petitioners' home on September *193 18, 1970, police lawfully seized the following items: (1) a cardboard box containing gambling paraphernalia; (2) $ 2,163 in cash; (3) several firearms and assorted ammunition; (4) a cut card; (5) a large quantity of water soluble paper; (6) an Armstrong Scratch Sheet dated September 18, 1970; (7) flash paper; (8) water soluble paper with code names written on them; (9) ten telephones, and (10) other gambling paraphernalia. While petitioners' home was being searched, Lieutenant Bedell seized a small personal telephone book from Simkins' shirt pocket containing a cut card inside. At this point Simkins became nervous and asked him not to "put that [the cut card] on me, on my person." He also told Bedell to take $ 2,000 from inside his safe and if it was not enough money he would get more. Bedell refused this offer. Later Bedell asked Simkins about documents seized from his home during the raid and about the Park Place operation. Simkins acknowledged that some of the documents related to the Park Place operation, but refused to answer questions about Anderson's role. The raid on the Park Place address which was carried out that same day resulted in the arrest of Sumter and another *194 person, Yates, on gambling related charges. It also resulted in the seizure of gambling paraphernalia at that location. Sumter and Yates subsequently pled guilty to gambling related offenses. Some of the documents seized during these September raids appear to be collection sheets similar to that seized on March 26, 1970 in petitioners' home. However, these documents do not indicate the period covered by them, and a considerable portion of the code names and numbers written are illegible. These documents were not used by respondent in computing the amount of unreported income listed in the deficiency notice issued to petitioners. In submitting affidavits to obtain the March and September search warrants, police followed the prevailing procedure of having several officers who participated in the investigation pool their information into one affidavit which was signed and sworn to by only one of them. Although all of these officers participated in the preparation of these affidavits, the affidavit was formally signed by Matthew Rettew. Observations by Officers Woo and Malkiewicz were accurately reported in the affidavits. None of the statements appearing in the affidavits were *195 known by Rettew to be false when made, and none of the information was the product or fruit of an illegal wiretap. Rettew's underworld informant during 1970 was Donald Hall. Hall gave Rettew whiskey and small amounts of money during the period 1967-1970 and, thereafter, substantial amounts of money and property totaling approximately $ 5,000 to $ 10,000. Hall was found murdered in 1973. Rettew eventually confessed to having accepted bribes from Hall and another gambler, McDaniels, and cooperated with Government investigators. He, his wife, and his children were relocated and given a new identity at Government expense because of the substantial danger to their lives resulting from this cooperation. During January 1971, Simkins moved that the evidence obtained as a result of the March 26, 1970, search be suppressed in criminal proceedings brought against him on grounds that the search warrant and the search and seizure pursuant to it violated his rights under the Fourth and Fifth Amendments to the United States Constitution and Federal Rules of Criminal Procedure. This motion was denied on November 17, 1971. As a result of a trial which followed, Simkins was convicted on April *196 25, 1972, of the following counts for which he had been indicted: FIRST COUNT: On or about March 26, 1970, within the District of Columbia, Roger W. Simkins was concerned as owner, agent, and clerk, and in other manners in managing, carrying on and promoting a lottery known as the numbers game. SECOND COUNT: On or about March 26, 1970, within the District of Columbia, Roger W. Simkins knowingly had in his possession and under his control, notations, records, receipts, tickets, certificates, bills, slips, tokens, papers and writing, current and not current, used and to be used in a lottery known as the numbers game. THIRD COUNT: On or about March 26, 1970, within the District of Columbia, Roger W. Simkins did knowingly, as lessee, agent, operator, and occupant, maintain, aid, and permit the maintaining of a gambling premises located at 1702 Shepherd Street, N.W., Washington, D.C. FOURTH COUNT: On or about March 26, 1970, within the District of Columbia, Roger W. Simkins did own and keep and have five pistols in his possession and under his control after having been previously convicted of a felony.
His conviction resulted in a sentence of imprisonment for 1 to 3 years on the first *197 three counts and for 1 to 3 years on the fourth count. The sentences were to run concurrently, and to be suspended during a 3-year period of probation upon his payment of $ 1,000 on each of the first three counts. Simkins also unsuccessfully challenged the September 1970 search warrant (as lacking probable cause) and the authorization given for the pen register intercept (on a variety of grounds). Thereafter, on August 1, 1972, Simkins pled guilty to the following first count of a five count indictment: Continuously during the period from about September 3, 1970, to about September 18, 1970, within the District of Columbia, Roger W. Simkins, Bessie Mae Yates and Orsa L. Sumter were concerned as owners, agents, and clerks, and in other manners in managing, carrying on and promoting a lottery known as the numbers game. He was sentenced to imprisonment from 1 to 3 years, the sentence to be suspended during a period of 3 years probation running concurrently with the probation relating to his earlier conviction. Respondent audited petitioners' 1970 joint Federal income tax return. Upon advice of petitioners' counsel, respondent did not contact petitioners directly for any information, *198 and neither requested information from petitioners or their representative, nor sought to audit their books and records. Respondent predicated the determination of omitted numbers income appearing in the notice of deficiency on information obtained from local police authorities. Respondent did not determine the numbers income by means of a net worth determination, nor a source and application of funds determination, nor a bank deposits determination. Respondent commenced a net worth determination but before completion abandoned it in favor of the method ultimately used in the notice of deficiency. Solely from his interpretation of the previously described collection sheet, respondent determined that the numbers operation involved therein produced $ 46,169.35 of gross receipts each week. Respondent next assumed that the operation was owned by Simkins and had been operating over a period from January 1, 1970, through and including September 18, 1970, when the police raided 3034 Park Place and (for the second time) petitioners' home. There were full 37 weeks during this period from January 1, 1970, until September 18, 1970. Therefore, to determine the total gross receipts produced *199 during 1970, he projected the $ 46,169.35 of weekly gross receipts over a 37-week period, producing a total of $ 1,708,265.95 of gross receipts for the year. This projection assumes that Simkins had an average of $ 46,169.35 worth of gross income each week for a period of 37 consecutive weeks beginning January 1, 1970. It also assumes that this amount was collected in cash or its equivalent each week and was therefore consistent with a cash receipts and disbursements method of accounting. Finally, respondent determined that Simkins realized 30 percent of the $ 1,708,265.95 of gross receipts as net profit from the numbers operation, yielding a total of $ 512,479.78 of income from numbers activities. Because of petitioners failure to clearly specify on their 1970 return that a portion of their Schedule C income represented income from numbers activities, respondent treated the entire $ 512,479.78 as unreported income from Simkins' numbers activities in the notice of deficiency. Petitioners submitted a summary of their assets owned at the beginning and end of 1970 and of cash availability and applications of cash during that year. As originally submitted, it listed six pieces of *200 real property as owned by petitioners. All were within the District of Columbia and all were acquired prior to 1955. This list inadvertently failed to include one parcel of real property in Maryland acquired prior to or during 1949 and titled in the name of Yvonne and another person. The summary also states, with respect to their Riggs National Bank savings account, that they began the year with $ 1,267.31 in this account, and ended it with $ 1,429.29, with the difference attributable to "accrued interest and deposit." The bank statements with respect to this account list its opening 1970 balance as $ 2,267.31, and its closing 1970 balance as $ 1,413.39, with the difference due to interest credited and two withdrawals of $ 450 each, with no deposits indicated. The summary lists petitioners as the owners of four Pontiac automobiles (model years 1966, 1967, 1968, and 1970) and a home purchased in 1954 which they estimated was worth $ 70,000 on January 1, 1970. Respondent knows of no assets other than those on the summary. Respondent also has no knowledge as to any gifts by petitioners during 1970. Yvonne maintained the family checking account, personally participated in the audits *201 of petitioners' joint tax returns and was aware of her husband's numbers activities.He spoke with her about his gambling operations in general terms, kept numbers paraphernalia in the house they shared, and did not refuse to answer questions she asked about his numbers activities. Petitioners lived in an attractive upper middle-class neighborhood and occasionally employed domestic servants. Yvonne was not employed during her marriage to Simkins until 1971. In approximately May 1971 she undertook training to become employed as a travel consultant. In August 1971 she found employment in that line of work at a salary of $ 550 per month. At the time of trial she was a senior reservations coordinator earning approximately $ 12,000 per year. OPINION Issue I: Burden of Proof
The first issue for our determination arises from petitioners' contention that respondent's audit and determination were so arbitrary and capricious as to deny the notice of deficiency its usual presumption of correctness.
Where respondent's determination is shown to have no rational foundation, petitioners are relieved of the burden of proving the correct amount of tax owing and it becomes the duty of this Court *202 to determine the correct amount of tax owing from all the evidence presented without regard to the presumption of correctness usually attached to respondent's determination. Helvering v. Taylor,293 U.S. 507 (1935); Piper & Jerge, "Shifting the Burden of Proof in Tax Court," 31 Tax Lawyer 303 (1978). However, petitioners have the initial burden of proving that the determination is, indeed, arbitrary, capricious, and without a rational foundation. Helvering v. Taylor,supra;Weimerskirch v. Commissioner,67 T.C. 672 (1977), on appeal (9th Cir. Mar. 29, 1977); Harbin v. Commissioner,40 T.C. 373 (1963). We find respondent's use of the projection method appropriate under all the facts and circumstances of this case. It has long been recognized that respondent is authorized to employ any reasonable method available to determine taxpayers' proper taxable income. See Holland v. United States,348 U.S. 121 (1954). "There is no restriction on the method or the theory by which the Commissioner tests his belief that unreported income exists. * * * We know of no requirement * * * that he must follow any set pattern." Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961), quoted with *203 approval in Harbin v. Commissioner,supra, at 377. The projection method utilized in this case has found widespread acceptance in the courts as a reasonable method of determining income for purposes of both the the Federal income tax [4] *204 and the Federal gambling excise tax. [5] The use of this method is especially appropriate here where the petitioners engaged in the systematic destruction of all records of numbers income. To deny respondent the use of such method "would be tantamount to holding that skillful concealment of income by failure to keep records and destruction of the original documentation from which income could be reconstructed would be an invincible barrier to proof." Mitchell v. Commissioner,416 F.2d 101, 102 (7th Cir. 1969), cert. denied 396 U.S. 1060 (1970), affg. a Memorandum Opinion of this Court.We conclude that repondent's application of the projection method herein is reasonable and appropriate. Petitioners object to our conclusion on four basic grounds. First, petitioners argue that they kept books and records adequate to determine their numbers income, that respondent never challenged these books during prior audits nor issued a notice *205 of insufficient records, and that, therefore, respondent acted arbitrarily in using a projection method. We find petitioners' characterization of their books and records of numbers income as "adequate" to be simply incredible in light of the total nonexistence of any such books or records whatsoever. Petitioners have presented this Court with nothing which could possibly be construed as books or records of the receipt of numbers income or of expenses in connection with such activity. To the contrary, it is clear that during 1970, petitioners completely failed to "keep such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters * * *" as required by section 1.6001-1(a), Income Tax Regs.They chose instead to destroy the comprehensive records which did exist, and now offer a computation based on "cash living expenses" allegedly supported by their net worth analysis. Even with respect to these methods no documentation for such living expenses or cash expenditures has been presented. Petitioners here fall below even the inadequate records offered in Plisco v. United States,306 F.2d 784, 786-787 (D.C. Cir. 1962) *206 cert. denied 371 U.S. 948 (1963), where the Court of Appeals stated: [Their] records contained no information concerning income and costs which might have enabled the Commissioner to verify the statements by comparing appellants' incomeexpense ratios with the ratios of similar enterprises. Without such data, the records reflect nothing more than the taxpayers' naked conclusions concerning the net taxable income or loss resulting from each day's operations. The Commissioner was not required to accept them. [Footnote omitted] Even if petitioners had kept books and records consistent with reported income, their existence would not prevent respondent from contesting their accuracy through an alternative means of determination. See Holland v. United States,supra;Campbell v. Guetersloh,supra. Respondent's method here is both reasonable and more reliable than the methods relied upon by petitioners since, unlike their methods, it is based upon an extrapolation from the only direct evidence of the specific amount of numbers income in the record, the collection sheet. Petitioners next argue that respondent acted arbitrarily in failing to contact petitioners and investigate their records *207 before issuing the notices of deficiency. However, neither statute nor case law require respondent to contact taxpayers and provide them with intra agency appeals proceedings prior to issuing a notice of deficiency. See generally Rosenberg v. Commissioner,450 F.2d 529 (10th Cir. 1971), affg. a Memorandum Opinion of this Court; Luhring v. Glotzbach,304 F.2d 560 (4th Cir. 1962); Cataldo v. Commissioner,60 T.C. 522 (1973), affd. per curiam 499 F.2d 550 (2d Cir. 1974).
Petitioners clearly suffered no prejudice from respondent's actions since they have no books or records of numbers income for respondent to inspect. We also note that petitioners' own counsel advised respondent not to contact petitioners directly for information. Respondent apparently did contact petitioners through their attorney prior to issuing the deficiency notice, but there is no record of what evidence of their numbers income, if any, petitioners on their own initiative offered respondent. We decline petitioners' invitation to examine the reasonableness of respondent's administrative decision to proceed expeditiously in auditing petitioners' return. "As a general rule, this Court will not look behind a deficiency *208 notice to examine * * * the propriety of respondent's motives or of the administrative policy or procedure invoked in making his determinations." Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). Respondent's administrative decision in this context clearly falls within the realm of judgments best left to sound agency discretion, and petitioners have demonstrated no abuse of discretion causing them injury. Cf. Estate of Brimm v. Commissioner,70 T.C. 15 (1978). [6]
As petitioners' third ground of objection to the deficiency's reasonableness, they contend that the projection method used by respondent improperly converts them from a cash basis method of accounting to an accrual basis. See section 446(c)(1) and (2). This argument misconceives and distorts the basis upon which respondent's determination is founded. Although the collection sheet represents accounts receivable, respondent simply assumed that the amounts recorded on the collection sheet reflect the amount actually collected weekly, since such amounts were normally collected on that basis. Thus, respondent uses the amounts *209 on the collection sheet only to determine cash collections, and determines gross income by the amount of cash so collected. This constitutes a cash basis method of accounting. [7]Section 1.446-1(c)(1)(i), Income Tax Regs.
Petitioners' fourth line of attack on the deficiency's reasonableness aims at the personal knowledge of the agent conducting the audit. Basically, they argue that he did not know how to interpret the collection sheet properly, and possessed little personal understanding of numbers operations.However, it appears that respondent utilized general agency experience with gambling operations and was influenced, in part at least, by our opinion in Shades Ridge Holding Co. Inc., v. Commissioner,T.C. Memo 1964-275, affd. per curiam sub nom. Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966), which also *210 dealt with a numbers operation and employed a 30 percent of bets figure to determine profits. Respondent was justified in using this approach, and the personal knowledge of the agent conducting the audit is irrelevant. Cf. Weimerskirch v. Commissioner,67 T.C. 672 (1977), on appeal (9th Cir. Mar. 29, 1977). Petitioners' arguments to the contrary are essentially those rejected previously in Delsanter v. Commissioner,28 T.C. 845, 857-858 (1957) (court reviewed), revd. on another issue, 267 F.2d 39 (6th Cir. 1959). No just reason appears why respondent should be precluded from relying on information derived from police authorities, as read in the light of the general experience of the Internal Revenue Service as a whole, and case precedent, without regard to a particular agent's expertise vis-a-vis an individual taxpayer's clandestine, illegal operation. Therefore, we adhere to our position as previously expressed in Delsanter.[8] *211 Finally, even if petitioners had succeeded in challenging the foundation upon which the deficiency is based, the deficiency itself would not be void or voidable. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974).See Estate of Brimm v. Commissioner,supra at 22, n. 7. Rather, we would be required to determine petitioners' tax liability from the facts presented with respondent merely having the initial burden of presenting evidence sufficient to make such determination. Helvering v. Taylor,293 U.S. 507 (1935). Sufficent evidence has been presented herein to fully support our determination of tax liability independently of the *212 deficiency's presumption of correctness. Issue II: Petitioners' Unreported Numbers Income
The principal issue we must decide is whether, and to what extent, Simkins' numbers income for 1970 exceeded that amount which petitioners reported. This is an essentially factual issue, and in choosing among sometimes contradictory or equivocal testimony we have been called upon as finders of fact to rely upon our judgment of the credibility and qualifications of the witnesses we observed testifying. See H. F. Campbell Co. v. Commissioner,443 F.2d 965, 968 (6th Cir. 1971) affg. 53 T.C. 439 (1969) as supplemented by 54 T.C. 1021 (1970). We determine that petitioners omitted $ 209,165.39 of income from Simkins' numbers operation in 1970. This determination is based on our conclusions as to five points upon which respondent's deficiency is based and which petitioners challenged. We conclude: (1) The Collection sheet evidences a numbers operation which generated $ 1,708,265.95 in wagers during 1970; (2) the owner of the numbers operation associated with the collection sheet realized a profit equal to 15 percent of these wagers; (3) Simkins owned the operation and realized the income attributable *213 to it during 1970; (4) deductible general operating expenses during 1970 amounted to $ 40,000; and (5) petitioners failed to report all of the net numbers income in excess of $ 7,074.49 for the taxable year 1970. We will proceed to discuss the reasoning behind each of these conclusions in the order in which they were presented. Three basic rationales have been presented by which to determine the amount of weekly wagers evidenced by the collection sheet. Respondent's primary position is that the collection sheet represents gross wagers made largely during the preceding week reduced by amounts collected during that week, but before the deductions for amounts paid for winning numbers. Respondent alternatively contends that it represents amounts bet, largely during the preceding week, after deductions for both winning bets and amounts collected (i.e. uncollected gross profits for the week). Petitioners contend that the collection sheet reflects accounts receivable due to bets made over an indefinite period and before deductions for winning numbers. [9] *214 They maintain that the volume of weekly bets cannot be computed from the collection sheet. We accept respondent's primary rationale. Sumter, the author of the collection sheet, testified that she took the slips of paper reflecting each week's bets and totaled them for each code named person, and then deducted payments made by those individuals during the week. The difference (along with any balance that might remain for the prior week) was then placed on the collection sheet next to the individual's code name. Since amounts were generally collected weekly, the amounts on the collection sheet largely reflect bets made during the preceding week. Although some amounts may represent bets attributable to an earlier period, it also appears from both the testimony and other gambling documents in evidence that substantial collections were made during the week on the current week's wagers. These bets would not be reflected on the collection sheet causing it to understate the current week's wagers. The collection sheet seized from petitioners' home supports this conclusion. Sumter testified that Simkins personally collected 5 to 10 percent of each week's wagers. Amounts marked *215 "Pd" on the collection sheet, which apparently reflect amounts actually collected by Simkins, [10] exceed 10 percent of the total amount. In some of the columns "Pd" is marked next to the numbers exceeding the amounts in the principal column, indicating a collection of the current week's wagers in addition to the previous week's. While we recognize that accepting the amount on the collection sheet as indicative of weekly wagers may lack precision, whatever inaccuracies result from this process are attributable to petitioners' intentional destruction of the detailed records of the numbers operation from which a more precise figure could be ascertained. In any event, this determination possesses the virtue of being based on the only direct evidence in the record of the specific amount of income from the extensive numbers operation petitioners clearly engaged in. It is infinitely more reliable than the cash expenditures-net worth methods petitioners advance. Furthermore, even under petitioners' interpretation of the collection sheet as something akin to accounts receivable, it is clear that *216 they understated numbers income if, as one would assume since a weekly statement was used, a significant portion of the accounts were collected on a weekly basis. At bottom, petitioners argue for a rejection of respondent's interpretation simply because it lacks mathematical certainty that weekly collections of wagers resulted in this amount. However, such mathematical certainty is not required. Mitchell v. Commissioner,416 F.2d 101 (7th Cir. 1969), cert. denied 396 U.S. 1060 (1970), affg. a Memorandum Opinion of this Court. As we stated in Harbin v. Commissioner,40 T.C. 373, 377 (1963): It is recognized that the "burden to adopt a method that will clearly reflect the income is on the Government equally as well as on the taxpayer." Bradstreet Co. v. Commissioner,65 F.2d 943 (C.A. 1, 1933). This does not mean, however, that where a taxpayer has deliberately and willfully failed and refused to keep and maintain any books or records of his business transactions, the Commissioner, in making his determination of a deficiency, is required to compute the net income of the taxpayer with mathematical exactness. "Under such circumstances, approximation in the calculation of net income *217 is justified." Harris v. Commissioner,supra.* * * We note the existence of substantial evidence indicating that the collection sheet reflects profits (as respondent alternatively contends) rather than just gross wagers. Respondent's expert testified that the collection sheet represented amounts owed on wagers after deducting the amounts collected during the week and credits due to winning numbers. He also stated that those amounts marked "Cr" could be accounts payable (as, for example, where credits for winning numbers exceeded wagers).[11] *218 Sumter never stated whether the amounts owed for winning numbers were deducted; however, to represent a true list of amounts owed for collection purposes, as petitioners contend, such amounts reasonably should have been deducted. The amount to be collected could not have been determined from this sheet if the credits for winning numbers were not also deducted. If the collection sheet did represent profits, then respondent's deficiency would be accurate if even as little as 30 percent were collected weekly. Despite this, the balance of the evidence supports respondent's primary position that the sheet reflects an operation generating $ 46,169.35 [12] *219 in wagers each week. This amount must be multiplied by the 37 weeks during which the numbers operation functioned during 1970 to compute the total wagers generated during 1970, $ 1,708,265.95. Petitioners do not seriously contest the use of 37 weeks, and, in contrast to Pizzarello v. United States,408 F.2d 579 (2d Cir. 1969) cert. denied 396 U.S. 986 (1969), there is ample evidence in Sumter's testimony to support the use of this period. [13] Our second conclusion, that 15 percent of these gross wagers should be used to determine the income from the operation rather than respondent's 30 percent figure, reflects our finding that the operation was primarily a lay off activity which, both parties apparently agree, yielded a 15 percent profit after payments for winning numbers. Sumter testified that the bulk of the wagers reflected lay off activity. Respondent's expert witness, while more equivocal, surmized from the size of the amounts and the likely identity of the persons listed by code names that the sheet reflected lay off activity. [14] Although some of the bets may have reflected activity as a backer (yielding *220 a 30 percent profit), we believe a 15 percent figure to be far more appropriate in view of the predominance of the lay off activities. Our conclusion that Simkins owned the operation rather than merely functioning as a collector for Anderson is based on several facts which, considered collectively, convince us of his ownership.Simkins owned the 3034 Park Place property which served as the office for the numbers operation. The collection sheet was found in his home, and while Sumter testified to making copies for Simkins and Anderson, she did not testify to making a similar copy *221 for "Lucky" who did the bulk of the collecting. This indicates Simkins was more than a mere collector. Also, the additional gambling paraphernalia seized in his home evidences an interest in the operation beyond that of a mere collector. Simkins regularly contacted Sumter as to the conduct of operations. Also, Simkins' conviction as a result of both the March and September raids demonstrates the existence of substantial ties to the operation motivating him to retain his connection despite obvious police awareness of his continued numbers involvement. Petitioners admit that Simkins owned the operation in question during the 1960's, but contend that he gave it to Anderson in 1967 or 1968 and retired because: (1) his health was failing, and (2) he did not want his son, Roger, in the business. Yet this explanation is flatly contradicted by the evidence of reported numbers income. To the extent numbers income was combined with rental income and reported on Schedule C, the amounts reported for pre-1968 years, when Simkins was admittedly an owner of a numbers operation, should be greater than later years. But Schedule C income for each of the years 1967, 1968, and 1969 is essentially *222 the same as income for the 1957-1966 period. Cf. Delsanter v. Commissioner,28 T.C. 845, 857 (1957), revd. on a different ground 267 F.2d 39 (6th Cir. 1959). As to petitioners' contention regarding the state of Simkins' health, we note that his heart problems and diabetes date back at least to 1959, yet he was admittedly able to run a numbers operation until the late 1960's. There is no indication that he missed time from work as an automobile salesman due to physical ailments. To the contrary, his salary rose in 1970 above of level of prior years. Finally, from the testimony given as to the duties of owners of numbers operations, it appears that strenuous physical exertion was not required. There are also logical and factual difficulties presented by petitioners' alleged desire to keep Roger out of the numbers business. If this were indeed their desire, it would have been more likely that Simkins would have terminated his illegal activities earlier and altogether. Petitioners never deny that Simkins retained his numbers operation ties during 1970, and continued to store gambling paraphernalia in his home, where Roger also lived. Indeed, on brief, petitioners state that "It *223 is not disputed that Roger Simkins was involved in numbers gambling in 1970, and, in fact, he reported over $ 7,000 of the net gambling income on Schedule C of his return." Roger admitted that Anderson was his father's employee during the 1950's, and the evidence indicates that he continued as an employee during 1970. Certainly it would be logical for Simkins to insulate himself through the use of a front man who would hire employees and run day-to-day operations. Also, respondent's expert witness testified to his belief that the "G.A." on the collection sheet referred to Anderson who was known as "Geechie" Anderson. Admittedly, the extent of shared control also suggests the possibility of a partnership between the two. However, both petitioners and respondent adamantly deny the existence of a partnership. Furthermore, the evidence before us presents no basis upon which to ascertain the terms of such an agreement. Thus, it is appropriate to treat Simkins as having realized the operation's entire income. See Gerardo v. Commissioner,552 F.2d 549 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court; Cannon v. Commissioner,533 F.2d 959, 961 (5th Cir. 1976) *224 affg. a Memorandum Opinion of this Court, cert. denied 430 U.S. 907 (1977); Shades Ridge Holding Co. Inc. v. Commissioner,T.C. Memo. 1964-275, affd. per curiam sub nom; Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966). Petitioners rely primarily upon the testimony of three persons to support their retirement theory: Sumter, Yvonne and Roger. Sumter's testimony fails to support it. Most importantly, she professed ignorance of the business relationship between Anderson and Simkins, and while she may have been hired by Anderson, this does not contradict our belief in Simkins' ultimate ownership. Additionally, Sumter testified as to Simkins' considerable involvement in the activities of the operation including the telephone calls made to her by both Anderson and Simkins. With respect to Yvonne and Roger, we note that both possessed substantial and apparent interests in the present litigation. Their explanation of Simkins' retirement was implausible and contrary to the manifest weight of the evidence. We are not bound to accept such testimony at face value. See Lovell & Hart, Inc. v. Commissioner,456 F.2d 145, 148 (6th Cir. 1972), affg. per curiam a Memorandum Opinion of *225 this Court; Ruark v. Commissioner,449 F.2d 311 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court. Based on the evidence as a whole and our evaluation of the testimony, we reject petitioners' retirement argument. Petitioners' explanation of Simkins' arrests and convictions stemming from the 1970 raids appears even more implausible. They contend that Officer Rettew arranged, at Hall's request, to have Simkins raided and arrested in order to make him appear to police as the operation's owner and thereby detract attention from Anderson, allegedly the real owner of the numbers operation in question. The facts argue otherwise however. Rettew's involvement in the Simkins investigation began relatively late, around March 1970. Other police officers' observations and a court authorized pen register intercept served to connect Simkins with the numbers operation involved herein independently of Rettew. Two officers who took part in that investigation testified as to their observations, and we found them to be extremely credible witnesses. Petitioners' argument that Rettew obtained information about Simkins through illegal wiretaps is at odds with their theory that *226 Anderson, through Hall, was directing his activities and giving him information. Rettew did not need illegal wiretaps to gain information about Simkins' connection with the numbers operation if Anderson were employing him and in fact owned the operation. We also find it highly unlikely that Anderson would seek to detract attention from himself by arranging a police raid on what petitioners claim was his own operation and the home of his former employer who was also making collections on his behalf. [15] *227 Logically one would attempt to distract police by directing attention toward an operation in which one has no interest. We note that even after Yvonne and Roger discovered the evidence they allege establishes the Rettew-Anderson conspiracy against Simkins, they received three telephone calls from Anderson, who at the time was incarcerated. We find this evidence of a continuing relationship inconsistent with their position here, and their explanation of the three calls highly dubious. We agree with petitioners that Rettew lacks credibility as a witness, and we have not relied upon his testimony in determining the amount of their deficiency since more credible and reliable evidence exists in the record. But it is one thing to say that a person lacks credibility, and quite another to infer the scheme petitioners attribute to Rettew, or to conclude that in the context of an investigation involving many honest officers, he had the capacity to implement any such scheme. We have carefully weighed all the evidence, considered the credibility of each witness whose testimony we received in court, and examined closely all the relevant, admissible evidence. We conclude that petitioners' theory was constructed from whole cloth *228 to meet the exigencies of the case. Rettew did not orchestrate the events leading to Simkins' arrest and the seizure of the documents presented to this Court in the illegal manner in which petitioners contend. [16] Our conclusion that Simkins incurred $ 40,000 of deductible expenses in operating the numbers business for salaries, overhead, and the like is essentially an estimate based on the meager record. Apparently *229 Sumter, Davis, "Lucky," and perhaps Yates worked in the operation for the full 37 weeks.We also include Anderson as an employee, although as indicated earlier, his role was ambiguous. Additionally, the operation clearly incurred general office and telephone expenses. All these expenses are deductible. Commissioner v. Sullivan,356 U.S. 27 (1958). Petitioners have failed to present evidence of the amount of their expenses, and we have therefore been limited to estimating such amounts under Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Finally, our conclusion that petitioners reported numbers income of $ 7,074.49 which was commingled with their rental income and reported on Schedule C of their 1970 return as "rents and services" is based upon consideration of the entire record and evidence. Yvonne and Bookman both testified that approximately $ 7,000 of numbers income was so reported. Bookman testified as to how the amount on Schedule C was reported and presented his workpapers [17] *231 which show that, as he testified, $ 7,074.49 was added to the total amount of checks received from the rental management agencies. [18] Other documentary evidence substantiates the amounts of these *230 checks, which when subtracted from total Schedule C income, equals $ 7,074.49 While the record is not entirely without contrary evidence, [19] *232 we find petitioners carried their burden of proof as to this amount. In summary, we conclude that Simkins realized a gross profit of 15 percent of the $ 1,708,265.95 generated by the numbers operation in question, which amounts to $ 256,239.88. In earning this he incurred $ 40,000 of deductible expenses and recognized net income of $ 216,239.88. Petitioners failed to report all but $ 7,074.49 in 1970. However, in opposition to our method of computation and our conclusions, petitioners assert the accuracy of their method of computing income. They seek to support this contention and rebut the contrary evidence through use of a net worth analysis supported by testimony as to their style of living and the income reported on their prior returns. They thus present a factual issue as to the more reliable method of income computation. For several reasons we find the method we have used far superior to those *233 espoused by petitioners. Initially, we again note that respondent possesses wide discretion in choosing a method of computing taxable income, especially where, as here, petitioners have failed to keep adequate records of a substantial source of income. See Holland v. United States,348 U.S. 121 (1954); Campbell v. Guetersloh,287 F.2d 878 (5th Cir. 1961); Harbin v. Commissioner,40 T.C. 373 (1963). Respondent "is not compelled to compute unreported income by several methods for the sake of corroboration if in his best judgment the method used produces a reasonably correct result considering the absence of required records." Gordon v. Commissioner,63 T.C. 51, 78, (1974), modified 63 T.C. 501 (1975), revd. in part on another issue 572 F.2d 193 (9th Cir. 1977), cert. denied     U.S.     (1978). The mere fact that petitioners present a net worth analysis corresponding to reported income does not require us to ignore evidence of substantial amounts of unreported income especially where, as here, petitioners have dealt largely in cash. Shades Ridge Holding Co., Inc. v. Commissioner,T.C. Memo. 1964-275 affd. per curiam sub nom. Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966). *234 While petitioners may properly offer in rebuttal the alternative methods of computation used here, they bear the burden of establishing its superior accuracy by comparison to that employed by respondent. Petitioners' net worth computation is an indirect method of determining income. It is not based on specific records of income and expenses, but rather on a general increase or decrease in total assets together with nondeductible expenditures. By contrast, respondent's projection method which we have also utilized here is based on the only direct record of the specific amount of income produced by the numbers activity in question. While this does not by itself disqualify use of a net worth approach, it is a factor militating against its use. With respect to petitioners' particular net worth statement, several weaknesses appear on its face. A large portion of the expenditures, $ 13,649.53, is simply designated as "Other Personal Disbursements and Consumption Expenses" without substantiation or further explanation as to application. At least one piece of real property did not appear on the original statement which petitioners nevertheless assert to have been carefully drawn up. *235 The records of one savings account, as we have noted in our findings of fact, fail to accord with the summary of the account on the net worth statement. Furthermore, we cannot ignore the substantial possibility of concealed assets. Simkins was apparently an intelligent person as well as a known gambler frequently audited by the Internal Revenue Service. His purchases of real property in the District of Columbia where he lived, and where respondent could reasonably have been expected to check the land records for his name, ended for no apparent reason about the same time he was first audited. Certainly, Simkins' background of bribery and covert, illicit gambling operations suggests a willingness to engage in such deceptive practices. [20] *236 The parties stipulated that numbers income would generally take the form of cash. However, petitioners' checking account indicates no cash deposits. Thus petitioners' practices avoided any permanent record of gambling income. Nor did their net worth statement disclose any assets outside the District of Columbia or of a type not easily discoverable by respondent, except for the Maryland property which was not listed on the original net worth statement. As to petitioners' evidence regarding their lifestyle, we note that much of it was general or conclusory. Even so, it indicates a life-style inconsistent with petitioners' reported income range. They had a large, rambling home they valued between $ 70,000 and $ 75,000 in 1970 which was in a neighborhood populated by upper income professionals. They at times employed domestic servants. Their net worth statement reveals that in 1970 they owned four Pontiac automobiles, model years 1970, 1968, 1967, and 1966. Roger testified to Simkins' readiness to lend $ 2,000 in cash to a known gambler, and in two raids police seized over $ 4,000 *237 mostly in cash from Simkins' home. This level of consumption, even assuming significant undisclosed cash savings or expenditures did not occur, is certainly consistent with an adjusted gross income significantly higher than the $ 23,000 petitioners reported. With respect to the consistency of reported income between prior returns and the 1970 return, we note again the failure of Schedule C income to reflect a decrease in numbers income which should have occurred if Simkins in fact had transferred the operation during 1967 or 1968. Although reported Schedule C income decreased in 1970, this is to be expected because of the termination of the operation after the September raid. Further, the tax returns, standing alone, are not conclusive evidence of income, [21] especially where, as here, they were reported from a lack of direct records of gambling income and in a frankly sloppy manner, as evidenced by the handling of rental expenses, and the 1969 misuse of income averaging. [22]
Petitioners' attempt to buttress the accuracy of these *238 returns by reference to the prior audits ignores the fact that respondent lacked evidence similar to the collection sheet during those years, and the difficulties created by petitioners' use of cash and lack of records. In any event, "[the] fact that there was no change in * * * earlier years' reported income is irrelevant to the issue in this case." Gordon v. Commissioner,63 T.C. 51, 78 (1974), modified 63 T.C. 501 (1975), revd. in part on another issue 572 F.2d 193 (9th Cir. 1977), cert. denied     U.S.     (1978). We wish to make one final point regarding our determination of petitioners' income. This Court appreciates the problems of record keeping and reporting faced by taxpayers like petitioners with significant amounts of income from illegal activities, and the issues raised by enforcement of the tax laws against such persons. See generally, Bittker, "Taxing Income From Unlawful Activities," 25 Case W. Res. L. Rev. 130 (1974). However, income, even though obtained from illegal activities, is subject to taxation. James v. United States,366 U.S. 213 (1961). Petitioners cannot claim exemption from the responsibility shared by all citizens to keep records of their income-producing *239 activities sufficient to enable that tax liability to be accurately computed. When they fail to do so, they cannot justly complain of the possible inexactitudes produced by methods of computation such as that utilized in this case. Furthermore, the difficulties inherent in such record keeping have not prevented others with income from illegal sources similar to petitioners' from maintaining books and records sufficient to withstand respondent's contrary determinations. E.g., Doyle v. Commissioner,T.C. Memo. 1954-234, affd. 231 F.2d 635 (7th Cir. 1956). See also Green v. Commissioner,66 T.C. 538 (1976). Yet petitioners have chosen to systematically destory the detailed records of numbers income prepared by the office personnel at 3034 Park Place, in favor of reliance upon indirect methods of computation. They demand that we ignore the only direct evidence of the magnitude of numbers activity because of uncertainties largely of their own making. In our determination we have attempted to fairly and accurately ascertain the unreported numbers income from the evidence presented keeping in mind all the numerous arguments raised by both parties. We have repeatedly given petitioners *240 the benefit of reasonable inferences from the record. But we cannot, and we will not, penalize respondent for the lack of more specific documentation and mathematical certainty caused by petitioners' systematic and intentional destruction of their records. To do so would unfairly penalize not only respondent, but those taxpayers keeping honest and accurate records who would be forced thereby to shoulder a larger portion of tax burden in addition to the costs and effort already expended by them in keeping such records. Such injustice would erode confidence in, and eventually undermine our self assessment system. We consider our determination as fair and accurate as is humanly possible. For whatever inaccuracies exist, if any, petitioners have no one to blame but themselves. Issue III: Section 6653(a)
The third issue involves the applicability of the section 6653(a) addition to tax. We believe that petitioners disregarded the record keeping requirements of section 6001 and were grossly negligent in the preparation of their returns.Thus, the facts justify the imposition of the statutory addition to tax.
Section 6653(a) states: NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS *241 WITH RESPECT TO INCOME OR GIFT TAXES.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.
The petitioners have the burden of proving that no portion of the understatement involved here was due to their "negligence or intentional disregard." Bagur v. Commissioner,66 T.C. 817, 823 (1976) on appeal (5th Cir. Dec. 13, 1976); Prescott v. Commissioner,66 T.C. 128, 140 (1976), affd. 561 F.2d 1287 (8th Cir. 1977). We have previously described in detail petitioners' intentional destruction of the detailed books and records of Simkins' numbers operation. This constitutes a disregard of the record keeping requirements of section 6001 and the regulations thereunder. The preparation of their 1970 return without a single document relating to the numbers operation constitutes negligence. It has long been recognized that a failure to maintain adequate records which results in a significant *242 omission of taxable income constitutes a basis for imposition of section 6653(a) addition to tax. E.g., Mack v. Commissioner,429 F.2d 182 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Marcello v. Commissioner,380 F.2d 509, 511 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Smith v. Commissioner,66 T.C. 622, 651 (1976) appeal dismissed (2d Cir. 1977). Petitioners seek to avoid this result by pleading reliance upon their accountant, Bookman, which they allege was reasonable in light of the previous audits. [23] While reliance upon professional advice normally constitutes evidence of due care, such reliance must be both reasonable and coupled with a good faith belief in the return's accuracy. Petitioners here fail on both grounds.This is not a case where petitioners sought advice on some technical refinement of the income tax laws.Rather, it involves a total failure by taxpayers to maintain any records. In light of the large amount of understated income and our impression of Yvonne as an intelligent, articulate person, we fail to believe petitioners' reliance was either reasonable or based on a good faith belief in the return's accuracy. Nor do we believe *243 petitioners were misled by respondent's frustrations during prior audits. We believe petitioners utilized the method described earlier to compute taxable income with indifference toward the method's accuracy and in the belief that their destruction of records and use of cash eliminated any evidence upon which an alternative computation could be based. But even if petitioners were otherwise justified in relying upon Bookman, we note that he prepared the return based upon information supplied entirely by Yvonne, yet omitted over $ 200,000 in income. Petitioners cannot avoid the consequences of section 6653(a) by pleading reliance upon an accountant who depended on them for information where the lack of information resulted in the understatement. [24]
Finally, "[aside] from the above considerations there is a personal responsibility of a taxpayer in reporting *244 his taxable gains and profits which he can not lightly avoid by leaving the preparation of his return to others." Clarke v. Commissioner,22 B.T.A. 314, 328 (1931). Issue IV: Innocent Spouse Defense
The next issue involves Yvonne's qualification for relief as an innocent spouse.
Section 6013(e)(1) provides that if: SEC. 6013(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.-- (1) IN GENERAL.-- Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission. *245 then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. To qualify for relief under this statute Yvonne has the burden of proving that she satisfies all three statutory requirements. Adams v. Commissioner,60 T.C. 300 (1973); Sonnenborn v. Commissioner,57 T.C. 373 (1971). To satisfy the second requirement (section 6031(e)(1)(B)) Yvonne must prove that she lacked actual knowledge of the omission and that a reasonably prudent person with such knowledge as she possessed would have no reason to know of the omission. See Sanders v. United States,509 F.2d 162 (5th Cir. 1975). Clearly she fails this test. Yvonne is an intelligent articulate woman who was well aware of her husband's numbers activities. She admitted that he spoke with her about these activities and answered any questions she asked. She lived with him in the same home in which police found the extensive gambling paraphernalia used as the basis for the deficiency asserted herein. It was Yvonne who originally hired Bookman, and who provided him with the information *246 used in preparing their tax returns. In her testimony she admitted possessing considerable knowledge of her husband's activities. She also prepared the family's checking account deposits, and possessed an awareness of their financial affairs. We believe Yvonne could have told us a good deal more about the operations than she revealed. We conclude that she probably knew that a large amount of income was not being reported during 1970, and that in any event, she clearly possessed knowledge of sufficient facts so that she had "reason to know" of the omission of numbers income. Our decision moots the question as to whether the third statutory requirement (section 6013(e)(1)(C)) has been met, and we express no opinion on this point. Issue V: Due Process
The final issue for consideration arises out of petitioners' contention that they have been denied due process of law by our failure to order respondent to provide them with either the address of or access to a third party witness, Rettew. Prior to trial petitioners demanded from respondent the address of, or access to, Rettew. Their stated intention was to gather information relating to Rettew's part in the investigation culminating *247 in Simkins' arrests and facts his investigation disclosed. Respondent did not possess such information, but eventually the United States Marshal's Service agreed to provide Rettew for trial. Rettew's testimony has been discussed earlier. His chief informant, Hall was shot to death in a parking lot in Washington, D.C., during 1973. Rettew, who had been receiving payments from various gamblers, agreed to cooperate with the Government, and as a consequence the lives of himself and his family were so imperiled that the United States Marshal's Office provided protective custody, relocating him with a new identity. Petitioners ignore the fact that respondent was as ignorant of Rettew's location as themselves, and insist that "the Government of the United States" knew Rettew's location and denied them the ability to adequately prosecute their case. This, they allege, violated their Fifth Amendment right to "due process of law." However, litigants in a civil proceeding [25] do not possess an unlimited constitutional right to pretrial access to nonparty witnesses. In fact, prior to the adoption of the Federal Rules of Civil Procedure the prevailing view denied parties the right to any *248 pretrial disclosure of an opponent's witness. 6 Wigmore on Evidence, section 1856c (1976), 8 Wright & Miller, Federal Practice and Procedure, paragraph 2013, p. 99 (1970). Present practice under the Federal Rules and under the Tax Court Rules of Practice and Procedure normally favors disclosure of all relevant information, but subject to the right of the Court to protect any affected person from undue hardship. See Rule 103, Tax Court Rules of Practice and Procedure. Compare under the Federal Rules: 8 Wright & Miller, supra, at 103; 4 Moore's Federal Practice, paragraph 26.57[3]. Since Hall was shot to death and threats were made against Rettew's life, the arrangements for protective custody were justified. There was good reason for fearing for Rettew's safety, and if anything happened to Rettew, it would be a severe deterrent to future witnesses cooperating with the Government in combating crime. Disclosure of Rettew's new identity and location would have endangered the lives of Rettew and his family and constitutes grounds for denying petitioners' requests. Cf. Zwack v. Kraus Bros. & Co.,237 F. 2d 255, 260 (2d Cir. 1956); United States v. Matles,19 F.R.D. 319 (E.D. N.Y. 1956). *249 Additionally, petitioners have established no prejudice to their case created by their failure to obtain a pretrial meeting with Rettew. [26] Rettew was neither a party to the case nor under a compulsion to discuss it with them outside of court. They possessed an extensive transcript of a previous case in which he testified, and documents supplied them during this proceeding from which to ascertain facts relating to his credibility and participation in the *250 relevant criminal investigation. During the trial, Rettew was available to petitioners without any time limits, and they examined him at considerable lengths. Their effective examinations of him in court convince us that they were not harmed in any manner. Petitioners have effectively attacked Rettew's credibility, and although we remain unconvinced of petitioners' allegations of misconduct during the Simkins investigation, we have chosen to base our findings with respect to the amount of unreported income on evidence independent of Rettew's testimony. [27]
Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the period in issue.↩
a. Income from Hialeah Race Track winnings. b. Income from an annuity which matured during 1969. The investment of this annuity's proceeds in a certificate of deposit payable in 1970 appears to be the principal reason for the dramatic increase in interest income in 1970 from 1969. ↩
c. Executor's fee.↩
2. Respondent does not request an increase in the deficiency due to this and we, therefore, do not order it taken into account in the Rule 155 computation necessitated by our opinion.↩
3. Pen register intercepts divulge when calls are made and the telephone numbers of outgoing calls. They do not divulge either the telephone numbers of incoming calls or the contents of calls.↩
4. Gerardo v. Commissioner,552 F.2d 549 (3d Cir. 1977), affg. on this issue and revg. on another issue a Memorandum Opinion of this Court; Gordon v. Commissioner,572 F.2d 193 (9th Cir. 1977), cert. denied     U.S.     (1978), affg. on this issue and revg. on another issue 63 T.C. 51 (1974) as modified by 63 T.C. 501 (1975); Mitchell v. Commissioner,416 F.2d 101 (7th Cir. 1969), cert. denied 396 U.S. 1060 (1970), affg. a Memorandum Opinion of this Court; Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966), affg. per curiam a Memorandum Opinion of this Court; Ches v. Commissioner,T.C. Memo. 1976-387, on appeal (4th Cir. June 16, 1977); Hackerman v. Commissioner,T.C. Memo. 1954-45, affd. per curiam 299 F.2d 959 (6th Cir. 1955). See Krassner v. Commissioner,T.C. Memo. 1974-223↩. 5. Pinder v. United States,330 F.2d 119 (5th Cir. 1964); O'Neill v. United States,198 F. Supp. 367 (E.D. N.Y. 1961). Compare Hamilton v. United States,309 F. Supp. 468 (S.D. N.Y. 1969) affd. 429 F.2d 427 (2d Cir. 1970), cert. denied 401 U.S. 913 (1971), with Pizzarello v. United States,408 F.2d 579 (2d Cir. 1969) cert. denied 396 U.S. 986 (1969. Cf. United States v. Janis,428 U.S. 433↩ (1976) (projection method utilized).
6. See generally, Davis, Administrative Law Text, sec. 28.05, pp 514-18 (3d ed. 1972).↩
7. Since respondent's projection method utilizes a cash basis of accounting, petitioners are clearly not entitled to a deduction from taxable income for accrued but unpaid Federal gambling excise taxes as was the case in Gordon v. Commissioner,63 T.C. 501 (1975), modifying 63 T.C. 51 (1974), revd. on this issue 572 F.2d 193 (9th Cir. 1977), cert. denied     U.S.     (1978)↩.
8. In support of their argument that the deficiency was determined in an arbitrary and capricious manner, petitioners also point to the fact that the report of the agent who audited them suggested the imposition of a civil fraud penalty based on an omission of $ 512,479.78 of unreported income while the deficiency asserted only a negligence penalty on that amount of unreported income. Far from supporting their reasoning, this indicates that respondent made a considered administrative determination of petitioners' case at a level above that of the auditing agent. In any event, further inquiry into the administrative process resulting in the deficiency notice issued to petitioners would be, under these facts, fruitless, unnecessary, and improper. See Estate of Brimm v. Commissioner,70 T.C. 15↩ (1978).
9. In some instances (where a "CR" appears after the amount), petitioners contend that the amounts were accounts payable by the owner of the sheet.
10. Petitioners suggest this explanation on brief and we find it is a reasonable explanation.↩
11. Petitioners' contention that some amounts listed were accounts payable is inconsistent with the position (which they otherwise advocate) that the sheet reflects only wagers before deductions for winning numbers. The only support for it in the record is respondent's expert who testified that if the sheet reflected net amounts after deductions for winning numbers, some amounts might represent accounts payable, in particular, those with "Cr" written next to them. However, the amounts associated with "Cr" total only $ 794.25 so that, assuming the sheet listed net amounts, the total net amounts receivable would be greater than net amounts payable by more than $ 46,000.
12. Respondent's determination is based on a figure of $ 46,169.35. We interpret the amounts on the collection sheet as totaling a greater amount. However, respondent on brief specifically eschewed the use of a larger figure. We therefore use this figure as the amount of weekly wagers. 13. For example, Sumter testified that she worked in the Park Place operation from sometime in 1969 until September 18, 1970, the date of the second raid. Additionally, it is extremely unlikely that an operation of this magnitude commenced on the day of the raid, particularly on the record before us.↩
14. Additionally, the search warrant affidavits also contain evidence supporting this conclusion.While we reserved decision on petitioners' hearsay objections to the admission of the arrest reports and search warrant affidavits, we now find these questions moot. We have based our decision on other evidence in the record independent of these documents which, to the extent they are admissible, only add further support to our holdings. We have considered the contents of those documents only with respect to the constitutionality of the search and seizures made under warrants issued pursuant to these affidavits.↩
15. We also note that despite their contentions to the contrary, petitioners have failed to prove that the affidavits submitted to obtain the search warrants were false. To the contrary, the evidence supports the veracity of matters asserted therein. We realize that Roger's testimony as to a meeting between his father and a known gambler is inconsistent with the description in Rettew's affidavit in that Rettew mentioned seeing the gambler reach into his pocket and Roger said he remembered definitely that he didn't. But we find his exact recall of an apparently miniscule aspect of this meeting which occurred 6 years prior to trial to be incredible.
16. Petitioners present a continuing objection to the admission of these documents on the ground that they are the product of illegal search and seizures arising out of Rettew's activities. On a factual level, we reject their contentions as unproven and against the manifest weight of the evidence. Further, Simkins formerly contested the validity of both warrants before his criminal trials and he cannot relitigate their validity here. See Commissioner v. Sunnen,333 U.S. 591 (1948); Clough v. Commissioner,T.C. Memo 1976-155. In any event, we note that admissibility of such evidence is controlled by United States v. Janis,428 U.S. 433 (1976), noted in 31 U. Miami L. Rev. 721 (1977); 30 Tax Lawyer 478 (1977). Cf. United States v. Paepke,550 F.2d 385↩ (7th Cir. 1977).
17. Respondent objects to the admission of this document on hearsay grounds although accepting it for certain limited uses which support his case. Identical objections are raised with respect to admission of the net worth statement and the tax returns for prior years. We find these objections inappropriate. First, all these documents were prepared by Bookman, who testified as to their preparation, from information supplied by Yvonne, who also testified regarding the accuracy of information contained therein. Both witnesses were subject to respondent's cross examination as to such matters. Additionally, respondent himself offers these documents as an admission of a party opponent although he seeks to limit the inferences we may draw to those favorable to him under the limited admissibility provision of Rule 105, Federal Rules of Evidence. This misconceives the law entirely. Rule 801(d)(2), Federal Rules of Evidence states that an admission of a party offered by an opposing party "is not hearsay." It does not purport to limit the use to which the finder of fact may put it. The limited use rule deals with another set of circumstances entirely. See generally, Weinstein, Berger, Weinstein's Evidence, par. 105[03] (1975). 18. Although it is not entirely clear, respondent appears on brief to argue that we should ignore the amount actually reported because of petitioners' double deduction of rental expenses noted in our findings of fact. However, respondent did not raise the issue of rental expense deductions in the notice of deficiency and disavowed any intention to seek an increased deficiency on this basis. If respondent now seeks to raise this issue through the back door of ignoring reported income, such approach is clearly improper. ↩
19. In particular, Bookman claimed that gambling income for the years 1957-70 was consistently treated as "services" for purposes of Schedule C. Yet petitioners computed their 1969 tax liability using income averaging of all their income despite the fact that numbers income, since derived from gambling, did not qualify for such treatment. Gordon v. Commissioner,63 T.C. 51 (1974) modified 63 T.C. 501 (1975) revd. in part on another issue 572 F. 2d 193 (9th Cir. 1977), cert. denied     U.S.     (1978)↩. Also for the years 1959-62 Schedule C income was listed as generated by "rentals" without mention of services. No self employment tax was paid on such income during 1959 or 1960 when Simkins' salary was less than the statutory maximum for Social Security withholding.
20. This stands in sharp contrast to Willis v. Commissiuner,T.C. Memo. 1957-223, cited by petitioners, where we specifically noted that: "This is not a case where the taxpayers * * * derived their income from some illegal activity." Also in contrast to Willis is the fact that respondent's projection method here is significantly better than petitioners' method, while in Willis we noted that "this is not a case where either the method of reconstructing income used by the taxpayers or that used by respondent might equally well show the income received."
21. See Malmstedt v. Commissioner,T.C. Memo 1976-46↩, on appeal (4th Cir. Jan. 5, 1977 (by petitioner), Jan. 26, 1977 (by respondent)). 22. See note 17, supra.↩
23. Respondent objects to the admission of the revenue agent's reports for these prior audits as well as to certain excise tax claims on the grounds of relevance.Although we agree that such documents are of only marginal relevancy, we see no prejudice to respondent's case by their admission.↩
24. Magill v. Commissioner,70 T.C. 465↩ (1978).
25. Smith v. Illinois,390 U.S. 129 (1968), relied on by petitioners is inapposite. While this is a civil proceeding, Smith was a criminal case grounded on the Seventh Amendment (which applies "in all criminal prosecutions"). Further Mr. Justice White's concurring opinion in Smith noted that no showing of danger to the witness's personal safety had been demonstrated, while a showing of potential danger has been made in this case. "We think that a reasonable interpretation of this area of exception, acknowledged by Smith and Alford, * * * would include an instance in which the physical safety of the witness or his family might be endangered." United States v. Alston,460 F.2d 48, 52 (5th Cir. 1972), cert. denied 409 U.S. 871↩ (1972).
26. The marshall's office agreed to make Rettew available to petitioners for a pretrial conference if Rettew was willing to meet with respondent. However, Rettew did not meet with petitioners prior to trial and the Tax Court Rules do not provide for third party discovery. See Tax Court Rules of Practice and Procedure, 60↩ T.C. 1057 (effective as of the date of trial). 27. In so doing, we do not mean to imply improper conduct on the part of the individuals representing respondent or the Marshal's office. Petitioners' innuendos of misconduct are wholly unfounded and uncalled for.↩